## STATE v. THEODORE H. LAMPE.[1]

### November 5, 1915.

### Nos. 19,395—(9).

**Attempt to commit a crime.**

1. An attempt to commit a crime, to be punishable as such, is the commission of some specific intentional overt act or acts tending directly, in the natural course of events, toward the commission of the crime.

**Mere solicitation of another to commit it insufficient.**

2. The mere act of soliciting another to commit a crime, or preparation therefor is not, in the absence of some overt act looking to its actual commission, sufficient to justify a conviction.

**Extortion — verdict not sustained by evidence.**

3. Evidence considered and *held* not to justify the verdict of guilty, in that the evidence fails to show an overt act essential to the conviction of an attempt to commit the crime of extortion.

[1] Reported in 154 N. W. 737.

Note.—On question of solicitation as attempt to commit crime, see note in 25 L.R.A. 434.

131 M.—5.

Defendant was indicted by the grand jury of the county of Lincoln, tried before Olsen, J., and a jury, convicted of the crime of attempted extortion, and thereupon sentenced to hard labor at the state prison for a period not exceeding two and one-half years. The execution of the sentence was stayed, and at the request of defendant the case was certified to this court. Remanded for further proceedings.

*Lyndon A. Smith,* Attorney General, *John C. Nethaway,* Assistant Attorney General, and *Louis P. Johnson,* County Attorney, for plaintiff.

*Howard & Gurley* and *A. K. Stauning,* for defendant.

Brown, C. J.

Defendant was indicted and convicted of the crime of attempted extortion and sentenced to a term in the state prison. Thereupon the trial court certified the cause to this court for the determination of two questions, namely:

(1) Does the indictment state facts sufficient to constitute the crime of attempted extortion? and

(2) Is the evidence sufficient to justify the jury in finding beyond a reasonable doubt that there was an overt act done, either by defendant, or by his accomplices, tending but failing to accomplish the crime of extortion?

1. We pass without discussion the first question, and hold that the indictment sufficiently charges the crime of attempted extortion, at least, as against an objection first raised at the trial, that the allegations thereof are sufficient to admit in evidence proof of all the essential elements of the crime; and come directly to the second question, namely, whether the evidence justifies the verdict.

2. The indictment charges that on the eighth day of March, 1915, at the village of Tyler, this state, defendant wrongfully, maliciously and unlawfully hired and employed Lauris Warming, Jesse J. Webster, and John A. Blaser, wilfully, feloniously and unlawfully to compel by threats of violence and through fear of injury one Hans Lavesson to consent to and to turn over and deliver to defendant the sum of about $10,000, either in money or securities. The indictment is quite long, but this statement embodies the substance of the charge. The charge is an attempt to commit the crime of extortion.

The evidence tends to show that at a time long prior to the date of the occurrences here involved defendant and Lavesson were copartners in the milling business at Lake Benton, in Lincoln county. This partnership was dissolved, and since then it has always been the claim of defendant that in the settlement of the partnership affairs Lavesson fraudulently and wrongfully cheated and defrauded defendant out of the sum of $10,000. This claim has dwelt constantly upon the mind of defendant, and the record shows that he has resorted to various iniquitous and unlawful means to compel a restitution of the money and payment of his claims, which Lavesson has at all times refused. Some time after the dissolution of the firm, defendant took up his residence in the village of Tyler, not far from Lake Benton, and within the same county, and, as we understand the matter, he has since resided at that place. A short time prior to the date named in the indictment, defendant conceived the idea of forcing payment from Lavesson through and by means of threats of injury to him, members of his family or his property. He was unwilling to do this by acts or conduct on his own part, and set in motion negotiations with Warming and Webster, the persons named in the indictment as having been employed for the purpose. Defendant was acquainted with Warming, who formerly resided in Tyler, but had no acquaintance with Webster. Defendant came to St. Paul for the purpose of enlisting the help and services of Warming. He laid the matter before Warming, who finally consented to go to Tyler, and to Lake Benton where Lavesson resided and see what he could do. It was suggested to him by defendant that he could go to Lake Benton, and inflict some injury to the person of Lavesson, or his son; to throw bricks through bank windows close to Lavesson, or through the windows of his residence, and in some way to induce Lavesson through fear to pay over the money. He was cautioned by defendant to do his work secretly, and so as to avoid detection. Warming was without funds, and defendant provided him with money to make the trip from St. Paul to Tyler and Lake Benton, and agreed to pay for the "job," in case of success, the sum of $1,000. According to the testimony of Warming, a witness produced by the state, he was unwilling, to use his own language, to "pull off any rough stuff," and he testified that it was understood that he was not to do anything illegal or unlawful. He ac-

companied defendant to Tyler, and defendant supplied him with money to go on to Lake Benton. He had some friends in the village, whom he visited, but he did nothing toward the collection of the money from Lavesson; he made no threats to Lavesson, either of injury to his person or property; in fact he did not see Lavesson at all, nor was he anxious to see him, for he was to work in secret. He made several efforts to get into communication with Lavesson over the telephone, but failed, and after remaining in town a few days returned to Tyler. The day following he made another trip to Lake Benton with the same result; returning to Tyler, he stated to defendant that he would have nothing more to do with the matter, and with money furnished by defendant left for his home in St. Paul. In about two weeks defendant again called upon Warming at his home in St. Paul and again urged him to undertake the matter, but Warming declined. At the time of so declining Warming stated that he thought he could find a man who would do the "job," to which defendant agreed. A few days thereafter Warming met Webster, the other person named in the indictment as having been employed by defendant, and laid the situation before him, resulting finally in the consent of Webster to undertake the work of forcing Lavesson to pay the claim. Webster was a tramp, without money, but readily agreed to make an effort to collect the claim. He started for Tyler on a freight train, and, though the distance was about 175 miles, he was a week on the way; riding in box cars and upon "bumpers." Soon after arriving he met defendant, and arrangements were soon made by which Webster agreed to go to Lake Benton for the "sole purpose of carrying out this job of hounding this money from Lavesson." Defendant supplied him with expense money and was careful to instruct him to do his work secretly and to avoid detection. He remained at Lake Benton about a week, but did nothing. He made no effort either to collect the money from Lavesson, or to intimidate or frighten him; in fact he had no communication with Lavesson directly or indirectly, though he stated to "some of the boys" about town the purpose of his presence in the village. He returned to Tyler and reported to defendant: "I don't think there is anything doing, they are having their places watched up there." After some discussion of the matter more expense money was furnished Webster and he returned to Lake Benton. In answer to a question by

the county attorney as to what he did on this occasion, he stated that he arranged with some of his friends to make a trip to Elkton, South Dakota; but when train time came the friends announced that they could not go. The parties were at the railroad station and, noticing the presence of Lavesson and his intention to board the train, Webster concluded to follow him. Lavesson's destination was Elkton, and he left the train at that point; Webster also. According to Webster's testimony Lavesson did not know him, or the nature of his business, and to "lull him away from me I stepped into some Albert's saloon and I bought myself a couple of drinks." He subsequently telephoned defendant that Lavesson was at Elkton and that he, defendant, had better come on and talk to him. Webster did nothing further, except to buy more drinks, and returned to Lake Benton, and upon his arrival was arrested for drunkenness and sentenced to 40 days in jail. This ended his connection with the matter.

This general statement of the evidence embraces all that has any pertinent bearing upon the issue involved. Much was said by defendant and Warming and Webster, in reference to plans and methods of putting Lavesson in terror and forcing him to pay over the money, but none of them were put into operation, or attempted to be applied. No communication of any kind was had by any of the persons named with Lavesson or any member of his family, and for aught that appears from the record Lavesson was not aware that efforts were being made by either Warming or Webster to intimidate or put him in fear of harm for his failure to pay the defendant's alleged claim.

An attempt to commit a crime, to be punishable as such, is the commission of some intentional preliminary guilty act or acts tending directly, in the usual course of natural events, toward the commission of the crime. 1 Wharton, Crim. Law, 268, 279. And it is uniformly held by the courts that, to justify a conviction, such overt act or acts must definitely appear, though they need not be such as necessarily to result in the commission of the crime if not interrupted; it is sufficient that they naturally tend in that direction, and were committed with guilty intent. State v. Dumas, 118 Minn. 77, 136 N. W. 311, 41 L.R.A. (N.S.) 439. Mere acts of preparation are not sufficient, nor does the naked solicitation of another to commit a crime, unaccompanied by acts and

preparation of the character stated, constitute an attempt within the meaning of the law. Clark, Crim. Law § 123; I Wharton, Crim. Law (11th ed.) 277; State v. Harney, 101 Mo. 470; State v. Butler, 8 Wash. 194, 35 Pac. 1093, 25 L.R.A. 434, 40 Am. St. 900; Hicks v. Com. 86 Va. 223, 9 S. E. 1024, 19 Am. St. 891; 8 R. C. L., p. 277, §295. What will constitute an act or acts tending directly to its commission will depend upon the facts of each particular case. As remarked by Chief Justice Start in the Dumas case, no rule can be laid down which will apply alike to all cases. The character of the crime intended to be committed, and the acts necessary to its commission, will control the particular case.

In the case at bar we find, after careful consideration of the evidence, no act or acts in preparation which may be said to bring the case within the rule stated, as acts and preparation tending directly to the commission of the crime. The evidence at most discloses only solicitations on the part of defendant, and the act of supplying his accomplices with expense money. The whole performance was to be carried out in secret, with no intention on the part of defendant or Warming or Webster of approaching Lavesson with a demand for the money, or of confronting him with threats of injury if he refused to pay the same. Warming abandoned the matter with an attempt to telephone Lavesson, and Webster, the tramp, seems to have been satisfied with a close attention to the flowing bowl. These parties were the hired agents of defendant, and he was responsible for their acts, but they did nothing looking to the commission of the crime of extortion. If defendant had done all that his hired agents did in the matter, or all that they agreed to do, it seems quite clear that he could not be convicted of an attempt to commit the crime of extortion. And since the mere solicitation is not an attempt to commit a crime, no crime was committed by defendant in hiring and procuring Warming and Webster to do the acts referred to, for the doing thereof had no direct tendency to the consummation of the principal crime. Our statutes[1] define the crime of extortion to be the obtaining of property from another, with his consent, induced by a wrongful use of force or fear. The use of force or fear is essential to the crime, and there is in this case an absence of the use of either.

[1][G. S. 1913, §8889].

The facts are wholly unlike those presented in the Dumas case. There defendant not only solicited his accomplices to commit the crime of arson, but supplied them with facilities to set the building on fire, and the accomplices with such material actually entered the building and were about to commit the unlawful act when they were frightened away by officers of the law. If they had not thus been prevented, the crime in the usual course of events, from the preparations made and material furnished by Dumas, would have been fully committed. That was a clear case of an attempt.

We therefore answer the second question in the negative, and remand the cause for further proceedings.