**UNITED STATES of America,
Plaintiff-Appellant,**

**v.**

**AMERICAN AIRLINES, INC. and Robert L. Crandall, Defendants-Appellees.**

**No. 83–1831.**

United States Court of Appeals,
Fifth Circuit.

Oct. 15, 1984.

Kevin R. Sullivan, Michael H. Simon, Anne E. Blair, Elliott M. Seiden, Antitrust Div., U.S. Dept. of Justice, Robert B. Nicholson, Edward T. Hand, J. Paul McGrath, Appellate Sect., Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Cantey, Hanger, Gooch, Munn & Collins, Cecil E. Munn, Robert S. Travis, Fort Worth, Tex., Akin, Gump, Strauss, Hauer & Feld, John L. Hauer, Dallas, Tex., Schnader, Harrison, Segal & Lewis, Joseph Tate, Philadelphia, Pa., Gibson, Dunn & Crutcher, John J. Hanson, Robert E. Cooper, Los Angeles, Cal., for defendants-appellees.

Before JOHNSON, HIGGINBOTHAM and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The question presented in this antitrust case is whether the government's complaint states a claim of attempted monopolization under section 2 of the Sherman Act against the defendants, American Airlines, and its president Robert L. Crandall, for Crandall's proposal to the president of Braniff Airlines that the two airlines control the market and set prices. The district court dismissed the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on the grounds that the failure to allege an agreement to monopolize was a fatal defect in the complaint and that more than an allegation of solicitation to monopolize was required to state a claim for attempted monopolization. We disagree and reverse.

## I.

In February 1982, American Airlines (American) and Braniff Airlines (Braniff) each had a major passenger airline complex, or "hub" at the Dallas-Fort Worth International Airport (DFW).[1] These hubs enabled American and Braniff to gather passengers from many cities, concentrate them at DFW, and then arrange connections for them on American and Braniff flights to other cities. The hub systems gave American and Braniff a marked competitive advantage over other airlines that served or might wish to serve DFW. In addition, the limitations on arrivals imposed by the Federal Aviation Administration (FAA) after the 1981 air traffic controllers' strike impeded any significant expansion or new entry by airlines into service at DFW. These limitations helped enable American and Braniff to maintain their high market shares in relation to other competitors.

In February 1982, American and Braniff together enjoyed a market share of more than ninety percent of the passengers on non-stop flights between DFW and eight

---

1. Many airlines structure their services around major airports in network complexes termed hubs. The term derives from the fact that the routes of an airline maintaining a hub operation resemble the hub and spokes of a wheel, with the major airport, for example, DFW, as the hub and the routes to other cities radiating like spokes.

major cities, and more than sixty percent of the passengers on flights between DFW and seven other cities. The two airlines had more than ninety percent of the passengers on many flights connecting at DFW, when no non-stop service was available between the cities in question. Overall, American and Braniff accounted for seventy-six percent of monthly enplanements at DFW.

For some time before February 1982, American and Braniff were competing fiercely for passengers flying to, from and through DFW, by offering lower fares and better service. During a telephone conversation between Robert Crandall, American's president, and Howard Putnam, Braniff's president, the following exchange occurred:

> Crandall: I think it's dumb as hell for Christ's sake, all right, to sit here and pound the ⃰ ⃰ ⃰ ⃰ out of each other and neither one of us making a ⃰ ⃰ dime.
>
> Putnam: Well—
>
> Crandall: I mean, you know, goddamn, what the ⃰ ⃰ ⃰ ⃰ is the point of it?
>
> Putnam: Nobody asked American to serve Harlingen. Nobody asked American to serve Kansas City, and there were low fares in there, you know, before. So—
>
> Crandall: You better believe it, Howard. But, you, you, you know, the complex is here—ain't gonna change a goddamn thing, all right. We can, we can both live here and there ain't no room for Delta. But there's, ah, no reason that I can see, all right, to put both companies out of business.
>
> Putnam: But if you're going to overlay every route of American's on top of over, on top of every route that Braniff has—I can't just sit here and allow

you to bury us without giving our best effort.

> Crandall: Oh sure, but Eastern and Delta do the same thing in Atlanta and have for years.
>
> Putnam: Do you have a suggestion for me?
>
> Crandall: Yes. I have a suggestion for you. Raise your goddamn fares twenty percent. I'll raise mine the next morning.
>
> Putnam: Robert, we—
>
> Crandall: You'll make more money and I will too.
>
> Putnam: We can't talk about pricing.
>
> Crandall: Oh bull ⃰ ⃰ ⃰ ⃰, Howard. We can talk about any goddamn thing we want to talk about.

Putnam did not raise Braniff's fares in response to Crandall's proposal; instead he presented the government with a tape recording of the conversation.

The United States subsequently sought an injunction under section 4 of the Sherman Act[2] against American Airlines and Crandall based on an alleged violation of section 2 of the act which forbids an attempted monopolization. On a motion by the defendants, the district court dismissed the government's complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6).[3]

The government asserts that the district court erred in holding that (1) an agreement is required for the offense of attempted monopolization; and (2) an attempt must amount to more than a solicitation to commit a crime.

## II.

■ The language of the Sherman Act, its legislative history, the general criminal law relating to attempt and the jurispru-

---

**2.** Section 4 provides in relevant part:

The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and

restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited.

**3.** The district court's opinion and order is reported in *United States v. American Airlines, Inc.,* 570 F.Supp. 654 (N.D.Tex.1983).

dence relating to attempt specifically under the Sherman Act, lead us to the same conclusion: the government need not allege or prove an agreement to monopolize in order to establish an attempted joint monopolization under section 2 of the Sherman Act.[4]

Section 2 of the Sherman Act, 15 U.S.C. § 2, provides, in pertinent part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

The Sherman Act "is designed to sweep away all appreciable obstructions so that the statutory policy of free trade might be effectively achieved." *United States v. Yellow Cab Co.*, 332 U.S. 218, 226, 67 S.Ct. 1560, 1564, 91 L.Ed. 2010, 2017 (1947).[5] The role of section 2 is:

> [t]o make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by [Section 1], that is, restraints of trade, by any attempt to monopolize ... even although the acts by which such results are attempted to be brought about ... be not embraced within the general enumeration of [Section 1].

*Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619, 645 (1911).[6] In creating the Sherman Act, Congress deliberately chose not to define all of the activities which might contravene the Act, in order to avoid creating loopholes. *Appalachian Coals, Inc. v. United States*, 288 U.S. 344, 359–60, 53 S.Ct. 471, 474, 77 L.Ed. 825, 829 (1933). Instead it gave the Sherman Act "a generality and adaptability comparable to that found to be desirable in constitutional provisions." *Id.*

Our first step in the analysis of the requisites of attempted monopolization is a consideration of the elements of the completed offense of monopolization.

◼ To establish illegal monopolization two elements must be shown: (1) the possession of monopoly power in the relevant market, and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778, 786 (1966).[7] Monopoly power is "the power to control price or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264, 1278 (1956). Accord, *United States v. Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. at 1704, 16 L.Ed.2d at 786. If these two elements are shown, the offense of actual monopolization is complete; it is well established that there is no additional requirement that the power actually be exercised. *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236, 1243 (1948); *American Tobacco Co. v. United States*, 328 U.S. 781, 810–13, 66 S.Ct. 1125, 1139–41, 90 L.Ed. 1575, 1594

---

**4.** In a review of a dismissal for failure to state a claim, we must accept all well-pleaded facts as true and must view them in a light most favorable to the plaintiff. *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983), *Battle v. Liberty National Life Insurance Co.*, 493 F.2d 39 (5th Cir.1974), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975).

**5.** See *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545, 549 (1958), *United States v. American Tobacco Co.*, 221 U.S. 106, 181, 31 S.Ct. 632, 648–49, 55 L.Ed. 663, 694 (1911).

**6.** Accordingly, the Act has not been viewed or "[i]nterpreted as if it were primarily a criminal statute...." *United States v. United States Gypsum Co.*, 438 U.S. 422, 439, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854, 870 (1978).

**7.** See also *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir.1984), *Mid-Texas Communications Systems, Inc. v. American Telephone & Telegraph Co.*, 615 F.2d 1372, 1385–86 (5th Cir.1980), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980), *Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 351 (5th Cir.1980), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980).

(1946); *United States v. Aluminum Co. of America,* 148 F.2d 416, 427 (2d Cir.1945). In *American Tobacco,* the Court explained:

[I]t is undoubtedly true ... that trade and commerce are "monopolized" within the meaning of the federal statute, when, as a result of efforts to that end, such power is obtained that a few persons acting together can control the prices of a commodity moving in interstate commerce. It is not necessary that the power thus obtained should be exercised. Its existence is sufficient.

328 U.S. at 811, 66 S.Ct. at 1140, 90 L.Ed. at 1595.

Applying these principles to the case at hand, we conclude that if Putnam had accepted Crandall's offer, the two airlines, at the moment of acceptance, would have acquired monopoly power. At that same moment, the offense of joint monopolization would have been complete.

■ Since the Act does not list or define the activities which may constitute the offense of attempted monopolization, we must examine the facts of each case, mindful that the determination of what constitutes an attempt, as Justice Holmes explained, "is a question of proximity and degree." *Swift & Company v. United States,* 196 U.S. 375, 402, 25 S.Ct. 276, 281, 49 L.Ed. 518, 527 (1904).[8] In *Swift,* the Court stated further that "when that intent and the consequent dangerous probability exist, this statute, like many others, and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." *Swift,* 196 U.S. at 396, 25 S.Ct. at 279, 49

L.Ed. at 524. The offense of attempted monopolization thus has two elements: (1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt to monopolize will be successful. *Transource International, Inc. v. Trinity Industries, Inc.,* 725 F.2d 274, 282 (5th Cir.1984), *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 276 (5th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). When evaluating the element of dangerous probability of success, we do not rely on hindsight but examine the probability of success at the time the acts occur. *Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980, 992 (5th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

■ The government unequivocally alleged that Crandall proposed to enlist his chief competitor in a cartel so that American and Braniff, acting together, could control prices and exclude competition at DFW; as Crandall explained to Putnam, "we can both live here and there ain't no room for Delta." As a result of the monopolization, Braniff would "make more money and I will too."

Both Crandall and Putnam were the chief executive officers of their airlines; each arguably had the power to implement Crandall's plan. The airlines jointly had a high market share in a market with high barriers to entry. American and Braniff, at the moment of Putnam's acceptance, would have monopolized the market. Under the facts alleged, it follows that Crandall's proposal was an act that was the

---

8. Justice Holmes, a leading authority on the law of attempt, had more than one occasion to explain the principles of attempt. In The Common Law (1881), he observed that "[e]minent judges have been puzzled where to draw the line [between what constitutes attempt and what does not], or even to state the principle on which it should be drawn ... But the principle is ... similar to that on which all other lines are drawn by the law. Public policy, that is to say, legislative considerations, are at the bottom of the matter; the considerations in this case being the nearness of the danger, the greatness of the harm, and the degree of apprehension felt." O. Holmes, Jr., *The Common Law* 68 (1881).

In *Commonwealth v. Peaslee,* 177 Mass. 267, 59 N.E. 55 (1901), Justice Holmes, writing for the Massachusetts Supreme Judicial Court, held that "if the preparation comes very near to the accomplishment of the act, the intent to complete it renders the crime so probable" that the act will constitute an attempt. 177 Mass. at 272, 59 N.E. 55. "Every question of proximity," Justice Holmes stated, "must be determined by its own circumstances ... analogy is too imperfect to give much help." *Commonwealth v. Kennedy,* 170 Mass. 18, 48 N.E. 770, 771 (1897).

most proximate to the commission of the completed offense that Crandall was capable of committing. Considering the alleged market share of American and Braniff, the barriers to entry by other airlines, and the authority of Crandall and Putnam, the complaint sufficiently alleged that Crandall's proposal had a dangerous probability of success.

The requirement that an accused's conduct have a dangerous probability of success expresses a significant antitrust principle that the antitrust laws protect competition, not competitors, and its related principle that the Sherman Act does not reach practices only unfair, impolite, or unethical. *Dimmitt Agri Industries, Inc. v. CPC International, Inc.*, 679 F.2d 516 (5th Cir. 1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983); *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir.1971) (Stevens, J.).

In *United States v. Mandujano*, 499 F.2d 370 (5th Cir.1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), we set forth the general requirements for criminal attempt. The defendant (1) "must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting," and (2) "must have engaged in conduct which constitutes a substantial step toward commission of the crime." 499 F.2d at 376. While similar, the common law requirement of a substantial step toward commission and dangerous probability of success are not the same. While both exact a relationship between an attempt and the offense, they differ in important ways. The focus of dangerous probability of success is upon the likelihood of the prohibited result, whereas the focus of the substantial step toward commission is upon a defendant's intent. The move along the increasing scale of proximity of attempt to offense carries with it a corresponding shift in focus from intent alone to substantive result. The inquiry is by necessity into the defendant's intent but under the Sherman Act that inquiry also includes a predictive examination of the results if the intent were accomplished. As

Justice Stevens, then Judge, put it in *Kearney*: "[w]e must consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market." 452 F.2d at 598. We acknowledge longstanding debate over the requirement of dangerous probability of success, and that substantial arguments that specific intent alone ought to suffice have been made. See, e.g., *Cooper, Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two*, 72 Mich.L.Rev. 373 (1974); indeed, one circuit does not require proof of dangerous probability. See *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). We note, however, both that dangerous probability remains an element of attempted monopolization in this circuit and that in concluding that the government here stated a claim we do not retreat from its proof requirements. We see Crandall's alleged conduct as uniquely unequivocal and its potential, given the alleged market conditions, as being uniquely consequential. In sum, our decision that the government has stated a claim does not add attempt to violations of Section 1 of the Sherman Act or lower the incipiency gate of Section 2.

Finally, we note one final consequence of our reasoning. If a defendant had the requisite intent and capacity, and his plan if executed would have had the prohibited market result, it is no defense that the plan proved to be impossible to execute. As applied here, if Putnam from the beginning never intended to agree such fact would be of no aid to Crandall and American.

The district court, relying on *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) and *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 513 F.Supp. 1100 (E.D.Pa. 1981), concluded that an agreement was a necessary element of an attempt to monopolize. We disagree with the district court's interpretation of these cases.

In *American Tobacco*, the government alleged that the tobacco company defendants had conspired in restraint of trade, attempted to monopolize, conspired to monopolize, and had succeeded in monopolizing the relevant markets. The trial court's jury charge stated that "[a]n essential element of the illegal monopoly or monopolization charged in this case is the existence of a combination or conspiracy to acquire ... the power to exclude competitors to a substantial extent," and that a completed agreement was an "indispensable ingredient of each of the offenses charged...." 328 U.S. at 785–86, 66 S.Ct. at 1127, 90 L.Ed. at 1581. The Supreme Court's grant of certiorari, however, was "[l]imited to the question whether actual exclusion of competitors is necessary to the crime of monopolization under § 2 of the Sherman Act." 328 U.S. at 784, 66 S.Ct. at 1126, 90 L.Ed. at 1580. The Supreme Court neither discussed nor decided whether an agreement was required to establish attempted monopolization.

The private plaintiffs in *Zenith Radio* alleged that numerous electronics products manufacturers had engaged in a massive, worldwide conspiracy in violation of both sections 1 [9] and 2. Plaintiffs bottomed their section 2 case on the existence of the conspiracy. The district court granted summary judgment in favor of defendants on the attempted monopolization claim because of lack of proof of a conspiracy. 513 F.Supp. at 1318–1321. On appeal, the Third Circuit reversed the district court in most respects after concluding that there was sufficient evidence to raise a material issue of fact regarding the participation of all but three of the twenty-four defendants in the alleged conspiracy. *In Re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238 (3d Cir.1983). The attempted monopolization charge accordingly was reinstated. Because plaintiffs' attempt case was predicated on a conspiracy theory, the Third Circuit did not discuss specifically whether the offense of attempted monopolization requires an agreement. The court did state, however, that "[o]nly the section 1 Sherman Act and the Wilson Tariff Act charges require proof of a combination or conspiracy". 723 F.2d at 252. A fair reading of these cases will not support appellees' contention that an agreement, which is required for a conspiracy, is also an element of attempted monopolization.

In an alternate ground for its dismissal of the complaint, the district court concluded that Crandall's proposal was a solicitation and that the common law, at the time of the enactment of the Sherman Act, required proof of more than a solicitation to establish an attempt.

Appellees argue that in 1890 the common law so clearly held that an attempt required more than a mere solicitation, that Congress intended to incorporate that well-accepted principle into section 2 of the Sherman Act. Our study of the authorities, however, leads us to the conclusion that there was no clear consensus among the pre-1890 cases on the issue. Less than half of the forty-two state jurisdictions had addressed the issue, even peripherally, by 1890. The jurisdictions which had confronted the question were evenly split.[10] These cases demonstrate that the answer to the question of whether a solicitation could be an attempt at common law was neither old nor well-recognized; to the contrary it was unsettled and still evolving. It

---

**9.** 15 U.S.C. § 1 provides, inter alia:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ....

**10.** In seven states, a solicitation could constitute an attempt: *State v. Hayes,* 78 Mo. 307 (1883); *State v. Ames,* 64 Me. 386 (1875); *Collins v. The State,* 50 Tenn. 14 (1870); *Mulligan v. The People,* 5 Parker 105 (S.Ct.N.Y.1861); *Griffin v. The State,* 26 Ga. 493 (1858), *State v. Carpenter,* 20 Vt. 9 (1847); *State of Connecticut v. Avery,* 7 Conn. 266 (1828). Other jurisdictions concluded that a solicitation could never be an attempt: *Hicks v. Commonwealth,* 86 Va. 223, 9 S.E. 1024 (1889), *Lamb v. State,* 67 Md. 524, 10 Atlantic 208 (1887), *State v. Baller,* 26 W.Va. 90 (1885), *Stabler v. The Commonwealth,* 95 Pa. 318 (1880), *Cox v. The People,* 82 Ill. 191 (1876), *McDade v. The People,* 29 Mich. 50 (1874), *Smith v. The Commonwealth,* 54 Pa. 209 (1864).

follows that in enacting the Sherman Act, Congress could not have supposed that a solicitation could never be an attempt. See *Associated Gen. Contractors v. Carpenters,* 459 U.S. 519, at 533 n. 28, 103 S.Ct. 897, at 906 n. 28, 74 L.Ed.2d 723, at 735 n. 28 (1983).

The district court also cited a number of modern cases in support of its conclusion that an attempt can never encompass a solicitation,[11] and appellees refer us to others.[12] These cases involving murder, sodomy, and other crimes, however, are not instructive in determining the requirements for attempted monopolization. In the cited cases, an agreement to the solicitation would not result in the completion of the substantive offense at the moment of agreement; other physical acts were required for the completed offense.

The federal courts have generally rejected a rigid or formalistic approach to the attempt offense. Instead they commonly recognize that "[t]he determination whether particular conduct constitutes ... [an attempt] is so dependent on the particular facts of each case that, of necessity, there can be no litmus test to guide the reviewing courts." *United States v. Ivic,* 700 F.2d 51, 66 (2d Cir.1983). Following this analysis, which we consider the better reasoned approach, several federal courts have concluded that a solicitation accompanied by the requisite intent may constitute an attempt.

In *United States v. May,* 625 F.2d 186 (8th Cir.1980), a defendant challenged his conviction for "unlawfully attempt[ing] to cause to have concealed, obliterated, or destroyed" government records in violation of 18 U.S.C. § 2071, on the grounds that his telephone call to the person who controlled certain relevant records constituted only a solicitation and was not an attempt. The Eighth Circuit affirmed his attempt conviction.

> May also argues that his ... conviction must fall because his conduct constituted only a solicitation, not an attempt to commit a crime. Specifically, he contends that the evidence showed only preparation and that no overt act constituting a substantial step in the attempt was shown. We disagree. When May called General Miller, he engaged in a course of conduct designed to culminate in the unlawful concealment of government records.

In *United States v. Robles,* 185 F.Supp. 82, 85 (N.D.Cal.1960), a solicitation by letter was held to be an attempt to unlawfully import a narcotic.[13]

In sum, we reject appellee's contention that the law in 1890 clearly required more than a solicitation to constitute an attempt. We also conclude that the better reasoned authorities support the view that a highly verbal crime such as attempted monopolization may be established by proof of a solicitation along with the requisite intent.

### III.

Our decision that the government's complaint states a claim of attempted monopoli-

11. 570 F.Supp. at 661.

12. See e.g., *State v. Otto,* 102 Idaho 250, 629 P.2d 646 (1981) (attempted murder); *People v. LaFontaine,* 79 Cal.App.3d 176, 144 Cal.Rptr. 729 (1978) (attempted lewd or lascivious act upon body of a child under fourteen years old); *Hutchison v. State,* 315 So.2d 546 (Fla.Dist.Ct. App.1975) (attempted murder); *Gervin v. State,* 212 Tenn. 653, 371 S.W.2d 449 (1963) (attempted murder); *State v. Bereman,* 177 Kan. 141, 276 P.2d 364 (1954) (attempted sodomy); *Cole v. State,* 14 Okl.Cr. 18, 166 P. 1115 (Okla.Crim.App. 1917) (attempted adultery); *State v. Lampe,* 131 Minn. 65, 154 N.W. 737 (1915) (attempted extortion).

13. Other cases also have concluded that a solicitation could be an attempt in certain circumstances. See e.g., *United States v. DeBolt,* 253 F. 78, 82–83 (S.D.Ohio 1918) ("mere solicitation" is sufficient for prosecution for attempt to make defective war material); cited with approval in *United States v. Mandujano,* 499 F.2d 370, 374 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975); *United States v. Ford,* 34 F. 26, 28 (W.D.N.C.1888) ("In some cases words spoken are *acts* sufficient to constitute an attempt to commit a crime, if they are of such a character as to be well calculated and adapted to accomplish the crime intended.") (emphasis in original).

zation is consistent with the Act's language and purpose.[14] The application of section 2 principles to defendants' conduct will deter the formation of monopolies at their outset when the unlawful schemes are proposed, and thus, will strengthen the Act.

Under appellees' construction of the Act, an individual is given a strong incentive to propose the formation of cartels. If the proposal is accepted, monopoly power is achieved; if the proposal is declined, no antitrust liability attaches. If section 2 liability attaches to conduct such as that alleged against Crandall, naked proposals for the formation of cartels are discouraged and competition is promoted.[15]

Appellees argue that price fixing is an offense under section 1 of the Sherman Act and since the government charges that Crandall sought to have American and Braniff fix prices, the government's complaint in reality seeks to have us write an attempt provision into section 1. This argument is meritless. Appellees confuse the section 1 offense of price fixing with the power to control price following acquisition of monopoly power under section 2. Under the facts alleged in the complaint, Crandall wanted both to obtain joint monopoly power and to engage in price fixing. That he was not able to price fix and thus, has no liability under section 1, has no effect on whether his unsuccessful efforts

to monopolize constitute attempted monopolization. See *Multiflex,* 709 F.2d at 992.

Nor do we agree with appellees' suggestion that firms or executives will be subject to liability for ambiguous or "intemperate words". We first note that under the allegations of the complaint Crandall's statements are not ambiguous. Second, a person must specifically intend to monopolize for his conduct to violate section 2; without the requisite intent, no liability attaches.

### CONCLUSION

We hold that an agreement is not an absolute prerequisite for the offense of attempted joint monopolization and that the government's complaint sufficiently alleged facts that if proved would permit a finding of attempted monopolization by defendants. We therefore vacate the dismissal of the complaint and remand for further proceedings consistent with this opinion.

### REVERSED AND REMANDED.

14. We reject appellees' argument that because the courts previously have not been faced with a factual situation similar to the case at bar, that the conduct cannot violate the antitrust laws. By deliberately choosing not to delineate the myriad activities which would be forbidden by the Act, Congress left to the courts the task of determining whether given conduct constitutes an offense under the Sherman Act. See *United States Gypsum Co.,* 438 U.S. at 474 n. 14, 98 S.Ct. at 2874 n. 14, 57 L.Ed.2d at 870 n. 14; *Appalachian Coals,* 288 U.S. at 360, 53 S.Ct. at 474, 77 L.Ed. at 829, *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 272 (2d Cir.1979), 2 P. Areeda & D. Turner, *Antitrust Law* ¶ 1310 (1978).

15. We disagree with the appellees' contention that our application of § 2 would discourage discussion among potential partners in mergers and joint ventures. Parties who wish to engage

in substantial mergers or joint ventures, under the pre-screening procedures of the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, must notify the Justice Department's Antitrust Division and the Federal Trade Commission before consummating the transaction. The government may have no objection to the transaction, or it may sue to block the transaction pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26. Chances that such a transaction would raise a dangerous probability of successful monopolization, are extremely remote.

Transactions that are too small to be subject to the Hart-Scott-Rodino Act will rarely pose a dangerous probability of successful monopolization. If there are such cases, however, and if in such cases the firm proposing the transaction acts with a specific intent to monopolize, then we see no reason why § 2 liability should not attach.