MERRITT, Circuit Judge,
dissenting.
In the recent Twombly and Iqbal cases, quoted and discussed at length by my colleagues in their majority opinion, the Supreme Court has started to modify somewhat, but not drastically, the notice pleading rules that have reigned under Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (“a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief’). These two cases now require more than simple notice and conclusory statements of ultimate facts about the case. Instead plaintiffs must plead “sufficient factual matter” to state a legal claim or cause of action that is not only “conceivable” but also “plausible,” independently of the notice given and the legal conclusions stated — in short, a set of “well-pleaded factual allegations” that make the cause of action “plausible.” *912 Iqbal, 129 S.Ct. at 1949-51 (2009). The Supreme Court majority has made clear that it is not making a major change in the law of pleading with Twombly and its progeny.[1]
As with any other new, general legal standard, the nature and meaning of the newly modified standard can be understood and followed only by analyzing how the standard is applied in actual cases like this case. Here my colleagues have seriously misapplied the new standard by requiring not simple “plausibility,” but by requiring the plaintiff to present at the pleading stage a strong probability of winning the case and excluding any possibility that the defendants acted independently and not in unison. My colleagues are requiring the plaintiff to offer detailed facts that if true would create a clear and convincing case of antitrust liability at trial without allowing the plaintiff the normal right to conduct discovery and have the jury draw reasonable inferences of liability from strong direct and circumstantial evidence.
I.
Twombly itself was a telephone antitrust case in which the only non-conclusory factual allegations in the complaint of a “contract, combination or conspiracy in restraint of trade” was that the former Baby Bell telephone companies continued to do business in their former home territories and did not “attack” and try to take market share away from the other operating Baby Bell companies in their home region. This was the full extent of the Twombly factual allegations of anti-competitive behavior. There was no allegation of action, as opposed to nonaction, misfeasance as opposed to nonfeasance. The Supreme Court sensibly pointed out that there could be many explanations for this similar economic nonaction other than the kind of agreement not to compete required for liability under § 1 of the Sherman Act. Thus the Supreme Court held that this one specific factual allegation of similar conduct was insufficient alone to state a “plausible” claim, though the Court seems to say that this kind of factual statement alone makes the pleading issue “close.” Twombly, 550 U.S. at 557, 127 S.Ct. 1955 (“allegation of parallel conduct ... gets the complaint close to stating a claim”).
If the Twombly pleading issue was “close,” but insufficient, based only on similar, stand-pat nonfeasance toward each other’s historical territory, the allegations concerning the in unison, affirmative behavior of the airlines in this case are obviously sufficient. The factual allegations in this case create an overwhelming case for the plaintiff to get by a motion to dismiss on the pleading.
Five times the airlines acted affirmatively, aggressively and publicly in unison to cut, fix and hold the price the airlines would pay the travel agents. Although at present there is no written contract to that effect, the facts alleged present so plain a case that they might as well have put the plan in writing.
1. The complaint alleges that United and American tried in 1981 and 1983, respectively, to fix the price lower to the travel agents but the other airlines would not go along. The allegations recite the *913 statements of an American Airlines executive that the airlines learned not to try again until everyone was on board. The complaint alleges inside information tantamount to a partial confession.
2. Then when they tried again in 1995 the plan went like clock-work. Everyone followed the leader five straight times until the price reached zero. The allegations of fact, based on testimony of insiders, was that the plan could not work without agreement but could work if the airlines acted in unison. Since the plan worked like a charm, the allegations raise a strong inference of agreement. Not as strong as allegations raising an inference that “the sun will rise in the morning” based on history, but strong enough to be more than “plausible.”
3. The airline executives in charge must not only have had hundreds of telephone conversations with each other and through intermediaries, but the specific, time-and-place factual allegations are that they met frequently over the period the airlines were acting in unison and according to plan. To suggest that they did not ever in all the meetings and personal contacts discuss their union of interests and how the cuts were working defies belief. The father of laissez faire economic theory, the liberal Scottish moral philosopher, Adam Smith, made the same basic point even more forcefully in The Wealth of Nations (1776), 230 years ago: “People of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public.” Book 1, Chap. 10, part 1, 148 (New York: Modern Library, 2000). If the factual allegations of meetings are true — a matter not yet determined by an impartial fact finder — the case of liability is certainly strong enough to go to the jury.
4. The airlines, and specifically American Airlines’ CEO Robert Crandall, attempted this type of coordinated scheme in the past. In 1984, Crandall was implicated in a price-fixing conspiracy because of comments he made to a competing airline president. In a recorded telephone conversation, the president of the competing airline asked Crandall how both airlines could continue to enjoy a monopoly over service to Dallas-Fort Worth International Airport, and Crandall instructed his competitor to raise its price and American would follow suit the very next day with a price increase of its own. U.S. v. American Airlines, Inc., 743 F.2d 1114, 1116 (5th Cir.1984). Having proposed to fall in line behind one another before strongly suggests that the airlines would do it again. In fact, when Delta announced a cap on travel agent commission in 1995, Crandall was responsible for setting American Airline’s travel agent commissions. Appellants’ Reply Brief at 18. Unsurprisingly, American followed Delta’s lead the very next day. Id.
To summarize, the complaint alleges that price cuts could not be made absent unilateral, follow-the-leader action by all of the defendants. It provides specific times and locations of numerous meetings attended by the defendants. Finally, and most importantly, the complaint ties the dates of those meetings with industry-wide simultaneous rate cuts that followed immediately thereafter. Reading these allegations as a whole, the complaint clearly satisfies the Twombly standard. In fact, the Supreme Court in Twombly noted that multiple competitors making “complex and historically unprecedented changes in pricing structure ... for no other discernible reason” would properly state a claim under § 1 of the Sherman Act. 550 U.S. at 557 n. 4, 127 S.Ct. 1955. That appears to be exactly the situation here.
*914 II.
The antitrust cases decided in both courts of appeals and district courts since Twombly and Iqbal are few, and most of the cases decided by district courts have yet to reach the courts of appeals. But see St. Clair v. Citizens Fin. Group, No. 08-4870, 2009 WL 2186515 (3rd Cir. Jul.23, 2009). That said, district court judges across the country have dismissed a large majority of Sherman Act claims on the pleadings misinterpreting the standards from Twombly and Iqbal, thereby slowly eviscerating antitrust enforcement under the Sherman Act. See, e.g., In re Hawaiian & Guamanian Cabotage Antitrust Litig., No. 08-md-1972 TSZ, 2009 WL 2581510 (W.D.Wash. Aug.18, 2009); Bailey Lumber & Supply Co. v. Ga.-Pac. Corp., No. 1:08CV1394LG-JMR, 2009 WL 2872307 (S.D.Miss. Aug.10, 2009); Burtch v. Milberg Factors, Inc., No. 07-556-JJF-LPS, 2009 WL 1529861 (D.Del. May 31, 2009).
The uniformity needed for the rule of law and equal justice to prevail is lacking. This irregularity may be attributed to the desire of some courts, like my colleagues here, to use the pleading rules to keep the market unregulated, while others refuse to use the pleading rules as a cover for knocking out antitrust claims. Compare In re California Title Ins. Antitrust Litig., 2009 WL 1458025 (N.D.Cal. May 21, 2009) (dismissing price-fixing complaint against major title insurance agencies who jointly set rates in states where they belonged to statutorily authorized rate setting organizations and employed similar rates in other states) with Standard Iron Works v. Arcelormittal, 639 F.Supp.2d 877 (N.D.Ill. 2009) (finding plausibility despite lack of direct evidence of collective action by looking at a series of industry meetings attended by steel executives that were followed by industry-wide production cuts).
III.
The Sherman Act was enacted in 1890 at the height and in the heat of controversy during a former Gilded Age. It was enacted to deter price fixing, market allocation among producers, and monopolization at a time of extreme disparities in economic power and wealth brought on by an extreme version of laissez faire economic theory.[2] After a long, slow climb toward a more equal distribution of economic power over the past century, in part because of the enforcement of the Sherman Act, we have recently returned to the great disparities that formerly existed. The failure to regulate the marketplace through antitrust enforcement is probably related to the mind-set that has dramatically reversed the earlier trend toward equality.[3]
*915 There are many, including my colleagues, whose preference for an unregulated laissez faire market place is so strong that they would eliminate market regulation through private antitrust enforcement. Using the new Twombly pleading rule, it is possible to do away with price fixing cases based on reasonable inferences from strong circumstantial evidence. As in this case, the proponents of this strategy propose to require either an express written agreement among competitors or a transcribed oral agreement to fix prices. Nothing less will do. Insider testimony, a strong motivation to collude, and aggressive, lock-step unanimity by competitors in pricing become insufficient to state a case. Over time, the antitrust laws fall further into desuetude as the legal system and the *916 market place are manipulated to benefit economic power, cartels, and oligopolies capable of setting prices. This case is just one small step in that direction. But this direction is unlikely to be changed unless the Supreme Court steps in to make it clear that Twombly may not be used, as my colleagues propose, as a cover for repealing regulation of the marketplace through private antitrust enforcement.
*915 [[Image here]]
FIGURE 1
The Top Decile Income Share, 1917-2007
Sourc»: TabfcM and Table A3, col. FSO-10Q.
Income is defined as market income (and excludes government transfers),
Top decile includes all families with annual income above $109,630 lo 2007.
Forty years ago the average CEO made twenty times what the average worker did; now it is nearly 400 times. Thomas Piketty & Emmanuel Saez, Income Inequality in the United States: 1913-1998, 118 Q.J. Econ. 1 (2003), data updated through 2007 available at http:// elsa.herkeley.edu/saez/.
From the time of Herodotus in 500 B.C. to the present, historians and political philosophers have believed that a high level of inequality of economic and political power undermines the basis of constitutional democracy and stable government generally: "So the Athenians had increased in strength, which demonstrates that an equal voice in government has beneficial impact not merely in one way, but in every way.” The Landmark Herodotus: The Histories 400 (Robert B. Strassler ed.2007). "The constitutional essential here is rather that below a certain level of material and social well-being, and of training and education, people simply cannot take part in society as citizens, much less equal citizens ... it is what is required to give due weight to the idea of society as a fair system of cooperation between free and equal citizens....” John Rawls, Political Liberalism 166 (1993).

. The Court has been careful to point out that Twombly should not be read to impose a “probabilityrequirement,” ora " 'heightened' pleading standard.” Twombly, 550 U.S. at 556, 595 n. 14, 127 S.Ct. 1955. The Court commented that an otherwise "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely.” Id. at 556, 127 S.Ct. 1955 (internal quotations omitted).

. See 21 Cong. Rec. 2460 (1889) (This inequality “has grown within a single generation out of the concentration of capital into vast combinations to control production and trade and to break down competition.”).

. A picture of the recent reversal of the long trend toward equality is as follows: