CONTINENTAL AIRLINES,
INC., Plaintiff,

v.

AMERICAN AIRLINES, INC. and AMR
Corporation, Defendants.

NORTHWEST AIRLINES,
INC., Plaintiff,

v.

AMERICAN AIRLINES, INC., and
AMR Corporation, Defendants.

Civ. A. Nos. G–92–259, G–92–266.

United States District Court,
S.D. Texas,
Galveston Division.

June 7, 1993.

Stephen D. Susman, Susman & Godfrey, Parker C. Folse, Susman Godfrey, L.L.P., Houston, TX, for Continental Airlines, Inc.

Joseph D. Jamail, II, Jamail & Kolius, Houston, TX, John S. McEldowney, Greer, Herz & Adams, Galveston, TX, W. James Kronzer, Jr., Houston, TX, John L. Cooper, Bruce R. MacLeod, Neil A. Goteiner, John S. Martel, Farella Braun & Martel, San Francisco, CA, for Northwest Airlines, Inc.

Ross Citti, Galveston, TX, Joe W. Redden, Jr., David J. Beck, Beck, Redden & Secrest, Houston, TX, James P. Simpson, Simpson, Beeton & Leavenworth, Texas City, TX, G. Irvin Terrell, Finis E. Cowan, Jr., Houston, TX, William F. Baxter, Stanford Law School, Stanford University, Stanford, CA, for American Airlines, Inc.

Ross Citti, Galveston, TX, Joe W. Redden, Jr., David J. Beck, Beck Redden & Secrest, Houston, TX, G. Irvin Terrell, Finis E. Cowan, Jr., Houston, TX, William F. Baxter, Stanford Law School, Stanford University, Stanford, CA, for AMR Corp.

KENT, District Judge.

## I. INTRODUCTION

Defendant AMR Corporation ("AMR"), through its wholly owned subsidiary, Defendant American Airlines, Inc.,[1] is, according to Plaintiffs, the largest and most profitable air carrier in the United States.[2] This suit arises out of Defendants' implementation of their Value Pricing plan, which was first announced to the public on or about April 9, 1992. The Value Pricing plan reduced the number of air fares offered by Defendants to four[3] and reduced the price of first class and coach tickets.

Plaintiffs allege that American has been attempting for more than ten years to 1) persuade its competitors to charge higher prices; 2) limit price competition; and 3) discipline those competitors who failed to follow American's price signals. The Value

---

1. Defendants are referred to collectively throughout as both "Defendants" and "American."

2. Defendants admit only that it is the "largest domestic carrier by some measures."

3. First class, coach, and two discount categories.

Pricing plan (Plaintiffs allege) was a means by which to achieve these goals. In particular, Plaintiffs allege that the Value Pricing plan was a predatory pricing scheme that guaranteed large losses to both American and its competitors such that American, as the largest carrier in the United States, would be able to drive all other carriers from the market (possibly excepting United Air Lines, Inc. ("United") and Delta Air Lines, Inc. ("Delta"), the next largest carriers). Thereafter, American (and possibly the other two remaining carriers) would be able to recoup their lost profits by charging supracompetitive prices.

Additionally, Plaintiffs allege that the purpose of reducing the number of fares offered was not, as Defendants' claimed, to simplify consumer choices, but to make it easier for American to identify those carriers who refused to follow its pricing signals. Because American is the largest carrier, the other airlines would be forced to come up with similar plans to compete. With all airlines using a simplified fare structure, American would be able to more easily identify those firms whose prices strayed from those set by American. Thereafter, those firms could be disciplined by other anticompetitive tactics.

Also, Plaintiffs assert that, prior to the announcement of the Value Pricing plan, American had been sending signals to United and Delta, urging them to combine with American to take illegal actions to fix prices and otherwise restrain trade. The announcement by United and Delta of pricing plans similar to the Value Pricing plan on the heels of American's public announcement of its plan, together with other factors, indicates that United and Delta accepted American's implicit offer to engage in a predatory pricing scheme with the goal of obtaining monopoly power and the resulting ability to charge supracompetitive prices.

Finally, Plaintiffs allege that Defendants' actions also violated the laws of the State of Texas.

Defendants now move, pursuant to Fed. R.Civ.P. 12(c), for judgment on the pleadings

as to Plaintiffs' state-law claims for tortious interference with business relations (sixth claim) and unfair competition (seventh claim) on the ground that such claims are preempted by the Airline Deregulation Act of 1978 ("ADA"). Additionally, Defendants move for Judgment on the Pleadings as to Plaintiffs' attempted joint monopoly claim (second claim) and conspiracy claim (fifth claim). Judgment on the pleadings is appropriate if "the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract v. Touchstone Properties*, 914 F.2d 74, 76 (5th Cir.1990).

Alternatively, Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56 as to Plaintiffs' attempted joint monopoly and conspiracy claims. Additionally, Defendants seek a summary determination that, as a matter of law, 1) what they refer to as the "marginal/average variable cost test" is the only appropriate standard by which to determine if American's actions were predatory and 2) Plaintiffs are collaterally estopped from relitigating the relevant market issue.[4]

■ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A fact is material if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists if there is a genuine issue for trial that must be decided by the trier of fact. In other words, summary judgment should not be granted if the evidence indicates that a reasonable fact-finder could find in favor of the nonmoving party. *Id.* See also *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ In ruling on a Motion for Summary Judgment, the Court must accept the evidence of the nonmoving party and draw all

---

4. Defendants have not moved for summary adjudication of Plaintiffs claim for attempted monop-

olization (first claim).

justifiable inferences in his favor. Credibility determinations, the weighing of the evidence, and the drawing of reasonable inferences are left to the trier of fact. *Anderson v. Liberty Lobby, supra,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

■ Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita, supra,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Leonard v. Dixie Well Serv. & Supply, Inc.,* 828 F.2d 291, 294 (5th Cir.1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no *genuine issue for trial.*" *Matsushita, supra,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (quoting Fed.R.Civ.P. 56(e)) (emphasis original).

## II. PREEMPTION OF PLAINTIFFS' STATE–LAW CLAIMS

■ Defendants contend that Plaintiffs' state-law claims for tortious interference with business relations[5] and unfair competition[6] are preempted by section 1305(a) of the ADA, 49 U.S.C.App. § 1305(a), which provides, in relevant part, that

no State or political subdivision thereof . . . shall enact or enforce any law, rule, regula-

tion, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier. . . .

Section 1305(a) "express[es] a broad preemptive purpose[,]" and thus it preempts all "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services.'" *Morales v. Trans World Airlines, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992). In the instant case, it cannot, in the Court's view, be gainsaid that Plaintiffs' state-law claims have a "connection with or reference to" Defendants' rates: Plaintiffs' claims stem from Defendants' price cuts and fare restructuring. Plaintiffs, however, contend otherwise.

## A. SECTION 1305(a) IS NOT LIMITED TO THOSE LAWS THAT CONFLICT WITH SECTION 1374 OF THE ADA

First, Plaintiffs assert that section 1305(a) preempts only those state-law claims that parallel or conflict with section 1374 of the ADA, which requires all air carriers to provide certain services and to refrain from certain practices. Plaintiffs, however, can cite no direct evidence in support of this contention. Instead, they rely on the ADA's savings clause, which provides that

[n]othing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

49 U.S.C.App. § 1506.

In the Court's view, the argument that section 1506 somehow limits the preemptive sweep of section 1305(a) is at odds with the Supreme Court's decision in *Morales.* In *Morales,* the plaintiffs argued that the preemptive reach of section 1305(a) is not as

---

5. Under Texas law, the tort of tortious interference with business relations consists of three elements:

1) the existence or prospect of a contract, 2) an intentional and willful act interfering with the contract that was calculated to cause damage to the plaintiff, and 3) damages.

*Kiepfer v. Beller,* 944 F.2d 1213, 1220 (5th Cir. 1991).

6. To make out a claim for unfair competition under Texas law, the plaintiff must prove that the defendant committed a separate unlawful act that, in addition to being unlawful, improperly interfered with the plaintiff's ability to conduct his business. *Schoellkopf v. Pledger,* 778 S.W.2d 897, 904 (Tex.App.—Dallas 1989, writ denied).

broad as that of the preemption clause contained in the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, because section 1506 is much broader than ERISA's savings clause.[7] The Court rejected this argument out of hand, citing the well-settled rule that a specific substantive statute takes precedence over a general one.[8] *Morales,* —— U.S. at ——, 112 S.Ct. at 2037 ("A general 'remedies' savings clause cannot be allowed to supersede the specific substantive pre-emption provision. . . .").

■ Moreover, notwithstanding the Court's statements in *Morales,* the language of section 1506 does not support Plaintiffs' narrow reading of section 1305(a). Quite simply, neither the text of either section nor the legislative history of the ADA supports the notion that Congress intended the preemptive force of section 1305(a) to be limited only to those claims which conflict with the provisions of section 1374.

First, section 1506 was enacted prior to section 1305(a). Section 1305(a) does not, however, reference section 1506 or section 1374. Instead, section 1305, in language that tracks ERISA's broad preemption provision, preempts all state laws that relate to airline rates, routes, and services.

Similarly, the relevant legislative history indicates that, in enacting section 1305(a), Congress intended, not simply to preempt those state laws that conflict with the affirmative duties imposed by section 1374, but rather "to ensure that [s]tates [cannot] undo federal deregulation with regulations of their own." *Morales,* —— U.S. at ——, 112 S.Ct. at 2034. *See also* S.Rep. No. 631, 95th Cong., 2d Sess. 98 (1978) (noting the impor-

tance of ensuring that "only one standard of regulation be provided for airlines operating under [federal] authority."). In the Court's view, a finding that Plaintiffs' state-law claims were not preempted would allow states to undo federal deregulation. Indeed, the instant case neatly illustrates the point: if state-law claims such as those advanced by Plaintiffs were not preempted, airlines would have to be wary lest their activities relating to setting rates, determining routes, and providing services run afoul of any number of state laws, *even though their activities fully complied with both the ADA and federal antitrust laws.*

Thus, in the Court's view, while section 1506 preserves all common-law remedies that are not superseded by the ADA,[9] it does not limit section 1305(a), nor does it preserve otherwise preempted claims, such as Plaintiffs'. *See Frontier Airlines, Inc. v. United Air Lines, Inc.,* 758 F.Supp. 1399, 1407–11 (D.Colo.1989).

## B. LACK OF A FEDERAL REMEDY IS NO BAR TO PREEMPTION

■ Next, Plaintiffs argue that their state-law claims are not preempted because the ADA does not provide a federal remedy for the injuries they allegedly suffered. This argument ignores the fact that "where Congress has expressly preempted state common law damages actions . . . its failure to provide a federal remedy will not defeat its intent to preempt state law." [10] *Stamps v. Collagen Corp.,* 984 F.2d 1416, 1425 (5th Cir.1993). Moreover, Plaintiffs' argument is disingenuous at best: while it is true that the ADA does not provide a remedy for the injuries

---

7. *See* 29 U.S.C. § 1144(b).

8. Moreover, Plaintiffs' argument sounds suspiciously like the argument advanced by the petitioners in *Morales* that section 1305(a) preempts only those state laws specifically addressed to the airline industry. The Court summarily rejected this argument, stating that

 this notion similarly ignores the sweep of the "relating to" language. We have consistently rejected this precise argument in our ERISA cases: "[A] state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect."

*Morales, supra,* —— U.S. at ——, 112 S.Ct. at 2038 (quoting *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 139–40, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990)).

9. For example, passengers injured in an air crash may pursue state tort claims against an airline.

10. Plaintiffs' argument would be an appropriate response to an assertion that their state-law claims were impliedly preempted by federal law. *Stamps v. Collagen Corp.,* 984 F.2d 1416, 1425 (5th Cir.1993).

allegedly suffered by Plaintiffs, the federal antitrust laws afford Plaintiffs several alternative means to secure redress.

## C. REGULATORY POTENTIAL

■ Additionally, Plaintiffs assert that their state-law claims are not preempted because the state laws at issue lack any proscribed regulatory potential. In the first instance, this argument is based on an erroneous interpretation of *Morales*. Plaintiffs note that the regulations at issue in *Morales* explicitly referred to airline rates and contend that state laws which do not so refer are not preempted unless they have a "significant" or "regulatory" effect on airlines or the rates they charge. The Court does not agree.

In *Morales*, the Supreme Court did not establish a two-part test to determine whether a state law is preempted by the ADA. Rather, the Court stated that it was obvious that the regulations at issue had a "connection with or reference to" airline rates because they explicitly mentioned rates. The Court also noted that, notwithstanding this fact, enforcement of the regulations would have a significant regulatory effect on airline rates. *Morales*, —— U.S. at ——, 112 S.Ct. at 2039. Thus, in determining whether Plaintiffs' state-law claims are preempted, the Court is not constrained to the mechanical application of a two-part test.

Moreover, even assuming that Plaintiffs' interpretation of *Morales* is correct, it is clear that enforcement of the laws at issue would have an effect on airline rates that would be both "significant" and "regulatory." Plaintiffs claim that, under Texas law, Defendants, in enacting the Value Pricing plan, tortiously interfered with Plaintiffs' prospective business relationships and engaged in unfair competition. If these causes of action are not preempted then, given that Defendants' operations are national in scope and that their headquarters are in Texas, each time Defendants wish to change their prices or their fare structure, they must ensure that their activities comply not only with the ADA and the federal antitrust laws but also with the laws of the state of Texas.[11] Otherwise, even if their conduct is proper under federal law, they may be subject to damages liability for violations of Texas law. In the Court's view, such an outcome would be both "significant" and "regulatory."

## D. THE ADA APPLIES TO NON-AIR CARRIERS

■ Finally, the Court disagrees with Plaintiffs' argument that even if its state-law claims against Defendant American Airlines, Inc. are preempted, its claims against AMR are not, because AMR is not an air carrier as defined by the ADA. Plaintiffs cite no authority for this proposition and the Court has found none.

Defendants contend that the ADA applies to non-air carriers as well. They rely on *Johnson v. Crandall*,[12] in which the court stated that

> [s]uch an interpretation of the statute [that section 1305(a) only applies to claims against air carriers] would frustrate congressional intent. By simply suing an air carrier's management or corporate parent, plaintiffs could effectively subject the air carrier to otherwise preempted state laws relating to rates, routes, or services.

*Id.* slip op. at 3.

In general, the Court agrees with this reasoning, pausing only to note that, in general, the corporate form insulates owners, directors, and the like from individual liability for actions taken on behalf of a corporation. Thus, only where, as here, a plaintiff seeks to hold a non-air carrier liable for its actions regarding airline rates, routes, or services or where it is alleged that the court need not recognize an air carrier's corporate status is there a chance that section 1305(a) will be applied to a non-air carrier.

Nothing in the ADA suggests that section 1305(a) applies only to suits against an air carrier. Rather, section 1305(a) preempts the enforcement of any state laws that have a

---

11. Indeed, as noted above, a claim for unfair competition can be based on a violation of any other law.

12. No. H–92–2155, (S.D.Tex. Sept. 28, 1992), *appeal pending*, No. 92–2850 (5th Cir.1993).

"connection with or reference to" airline rates, routes, or services. The language, legislative history, and structure of the ADA make it clear that, in enacting the ADA, Congress intended to assert federal control over the regulation of airline rates, routes, and services. Thus, in the Court's view, it is preposterous to assume that Congress intended to block the prosecution against air carriers of certain suits but to allow those same suits to proceed against all others.

■ In the instant case, Plaintiffs seek to hold AMR liable for its actions in establishing the Value Pricing plan. Therefore, in the context of this law suit, the state laws in question have a "connection with or reference to" airline rates and are therefore preempted. Consequently, the Court finds that all of Plaintiffs' state-law claims, both those against American Airlines, Inc. and those against AMR, are preempted by section 1305(a) of the ADA.

## III. STANDARD FOR PREDATORY PRICING CLAIMS

Defendants also contend that the Fifth Circuit and the Supreme Court have adopted what Defendants call the "marginal/average variable cost" test as the only appropriate test by which to judge predatory pricing claims.

■ As an initial matter, the Court agrees with Defendants that, in many instances, predatory pricing claims should be viewed with suspicion. First, the economic incentives to engage in predatory pricing schemes are few. In the short run, the would be predator, as well as its intended victims, will incur losses. The predator can only make up these losses if it 1) achieves monopoly power and 2) maintains monopoly power long enough to recoup its losses and collect some profits. *Matsushita Elec. In-*

dus. Co. v. Zenith Radio, supra, 475 U.S. at 589, 106 S.Ct. at 1357. Thus, " '[t]he predator must make a substantial investment with no assurance that it will pay off.' " *Id.* (quoting Easterbrook, Predatory Strategies and Counterstrategies, 48 U.Chi.L.Rev. 263, 268 (1981)). "For this reason ... predatory pricing schemes are rarely tried, and even more rarely successful." *Id.*

Moreover, the purpose of the antitrust laws is to foster competition, and "cutting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in ... cases [in which predatory pricing is alleged] are especially costly because they chill the very conduct the antitrust laws are designed to protect."[13] *Id.* at 594, 106 S.Ct. at 1360.

■ By the same token, however, the plausibility, or lack thereof, of Plaintiffs' predatory pricing claims does not alter the standard for judgment under Rule 12(c) or Rule 56. Notwithstanding the Supreme Court's admonishments in *Matsushita* and other cases, summary judgment or judgment on the pleadings is not appropriate in a predatory pricing case unless no genuine issue exists for trial. *See, e.g., Eastman Kodak Co. v. Image Tech. Serv., Inc.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992).

## A. AVERAGE VARIABLE COST VS. MARGINAL COST

Before considering Defendants' claim that the "marginal/average variable cost" test is the only test by which predatory pricing claims may be judged, the Court considers Defendants' contentions concerning the proposed test itself, *viz.* that average variable cost ("AVC") is a surrogate for marginal cost ("MC").

---

**13.** According to many commentators, the bankruptcies and other financial reversals suffered by many airlines in the last decade represent no more than the normal side effects incident to a return to a market system after a period of intense regulation.

Until the late 1970s, the federal Civil Aeronautics Board limited competition among airlines by restricting the entry of airlines into most cities. Ticket prices were high, and many flights were virtually empty. Criticism led to deregulation by 1980 of pricing and entry on domestic routes, and the industry saw intense rivalry along with bankruptcy of poorly managed airlines.

Paul A. Samuelson & William D. Nordhaus, Economics 75 (14th ed. 1992) [hereinafter Samuelson].

Plaintiffs correctly point out that conceptually, AVC is different from MC. Variable costs are costs that change with the level of output, such as raw materials, wages, and fuel.[14] Samuelson at 120. Variable cost ("VC") is the sum of all variable costs at a particular level of output. AVC is VC divided by output. *Id.* at 123.

MC, by contrast, is the cost of producing one extra unit of output, given a particular level of production. *Id.* at 121: Thus MC includes only increments of additional cost, while AVC includes all variable costs for all units of output. Consequently, it cannot be said that MC is a perfect substitute for AVC.

On the other hand, the two concepts are not so dissimilar as to be unrelated. Marginal cost pricing, that is, setting price equal to marginal cost, "is the ideal target for economic efficiency," [15] and setting prices below MC will result in losses. MC is, however, an economic concept with no direct accounting analog, and thus it may not, in every case, be possible to determine a firm's MC from an examination of its records. Therefore, under appropriate circumstances, AVC may serve as a substitute for MC.[16] *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc.,* 735 F.2d 884, 889 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985).

■■■ However, AVC is not quantitatively equivalent to MC. Rather, where MC is less than average cost ("AC"),[17] AC is decreasing and vice versa. Samuelson at 123. Therefore, the relationship between AC and MC, and thus between AVC and MC (since AC = AVC + AFC = AVC + k), is not constant. If AVC is falling, setting prices equal to MC will still result in losses, because if AVC is falling, then MC < AC. That is, when cost is

decreasing, the cost of producing the next unit is less than the average cost of producing the previous units because the individual cost of producing each of those units was higher than the cost to produce the next unit. Samuelson at 343. Thus, it is not necessarily a complete defense to a predatory pricing claim that the alleged predator set its prices equal to, or slightly above, its marginal cost.

However, where, as in the airline industry, variable costs change very little,[18] AVC is close to MC at all levels of output. As AVC approaches zero, TC approaches FC, and thus MC, the cost of one additional unit of output (in this case the cost of carrying an additional passenger), likewise approaches zero. Therefore, where AVC is very low, the difference between AVC and MC is negligible. Moreover, in such a situation, ATC bears a constant relationship to both AVC and MC (since ATC = AVC + AFC = AVC + k).[19] Given these apparent relationships, the Court assumes that Plaintiffs' could use any of these variables to demonstrate the existence of a predatory pricing scheme. If, however, it becomes apparent that the relationship posited above does not exist, the Court will be pleased to revisit the issue.

## B. THERE ARE TWO TESTS FOR PREDATORY PRICING IN THE FIFTH CIRCUIT

■■■ The Court disagrees with Defendants' contention that the "marginal/average variable cost" test is the only test by which to judge Plaintiffs' predatory pricing claim. The standard applied in this circuit is quite clear.

One seeking to establish predatory pricing must demonstrate that the defendant "at least sacrificed present revenues for the

---

**14.** As opposed to fixed cost ("FC"), which do not change with output. VC + FC = total cost ("TC").

**15.** Samuelson at 343.

**16.** Ordinarily, a firm will desire to set its price above TC, because only if price > TC will the firm make a profit. If this is not possible, the firm will, at the very least, desire to set prices above AVC. If it sets prices below AVC, its losses will be more than they would be if its output were zero.

**17.** Average cost is TC divided by output.

**18.** *See Morales v. Trans World Airlines, supra,* —— U.S. at ——, 112 S.Ct. at 2040.

**19.** Hence the court's statement in *Phototron Corp. v. Eastman Kodak Co.,* 842 F.2d 95 (5th Cir.), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1996, 100 L.Ed.2d 228 (1988), that "predatory pricing is pricing below marginal or average variable cost." *Phototron,* 842 F.2d at 99 n. 4.

purpose of driving [the plaintiff] out of the market with the hope of recouping losses through subsequent higher prices."

*Bayou Bottling, Inc. v. Dr Pepper Co.*, 725 F.2d 300, 305 (5th Cir.) (quoting *International Air Indus., Inc. v. American Excelsior Co.*, 517 F.2d 714, 723 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976)), *cert. denied*, 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984). As a general rule, a plaintiff cannot make such a showing without demonstrating that the defendant set its prices below its AVC.[20] However, if the barriers to new entry in the relevant market are sufficiently high, it may be possible for a potential monopolist to engage in predatory pricing without setting its prices below its AVC. *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc., supra*, 735 F.2d at 889–90. If a plaintiff can demonstrate that such barriers exist, it can maintain a predatory pricing claim if it can demonstrate that the defendant set its prices below its short-run, profit-maximizing price, regardless of whether this price was below defendant's AVC. Thus,

> in order to prevail as a matter of law, a plaintiff must at least show that either (1) a competitor is charging a price below his average variable cost in the competitive market or (2) the competitor is charging a price below its short-run, profit-maximizing price and barriers to entry are great enough to enable the discriminator to reap the benefits of predation before new entry is possible.

*International Air Indus., Inc. v. American Excelsior Co., supra*, 517 F.2d at 724 (footnotes omitted). *See also id.* at 890.

In the instant case, except for some conclusory statements to the effect that barriers to new entry are not high in the air travel industry, Defendants do not assert that no genuine issue of material fact exists as to whether the barriers to new entry are so high that a potential predator could drive competitors out of the market by setting prices at some level above its AVC but below the price that would maximize its profits in the short run.[21] Therefore, the Court does not address this issue. Instead, Defendants assert, first, that the Supreme Court has rejected the profit-maximizing test, and, alternatively, that the profit-maximizing test is inapplicable in this case for reasons unrelated to the barriers to new entry in the relevant air transportation markets.

The Court does not agree with either of these contentions. First, the Supreme Court did not reject the profit-maximizing test in *Matsushita Elec. Indus. Co. v. Zenith Radio, supra.* Indeed, in *Cargill, Inc. v. Monfort of Colorado, Inc.*,[22] a post–*Matsushita* case, the Court expressly noted that "no consensus has yet been reached on the proper definition of predatory pricing" and left open the question whether "above-cost pricing coupled with predatory intent is ever sufficient to state a claim of predation." *Id.* 479 U.S. at 118 n. 12, 107 S.Ct. at 493 n. 12. It is true that in *Matsushita* the Court stated that " 'predatory pricing' means pricing below some level of cost," and that "[f]or purposes of this case it is enough to note that respondents have not suffered an antitrust injury unless petitioners conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost." *Id.* at 584 n. 8, 106 S.Ct. at 1355 n. 8.

A rejection of the profit-maximizing test may not, however, be inferred from these statements. First, the plaintiffs in *Matsushita* did not assert that the barriers to new entry in the relevant market were so high that a potential predator could drive competitors out of the market by setting prices at some level above its AVC but below its short-run profit-maximizing price. Thus, the Court had no reason to consider the profit-maximizing test.

---

**20.** *See supra* note 16.

**21.** Additionally, Plaintiffs have presented some evidence that significant barriers to entry exist in some air transportation markets. *See* Final Report of Expert Morton Ehrlich § 6.3, at 30–31 [hereinafter Ehrlich Report]; Final Report of Expert Michael E. Levine § VI, at 25–27 [hereinaf-

ter Levine Report]; Final Report of Expert Professor Robert S. Pindyck § 10, at 21–24 [hereinafter Pindyck Report].

**22.** 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

Second, the profit-maximizing test is, contrary to Defendants' contention, a measure of cost, albeit an indirect one. The profit-maximizing test measures not only prices but also profits, both real and anticipated. One cannot measure profits without measuring, or at the very least making some assumptions about, costs.

■ Moreover, the Court does not accept Defendants' contention that the Fifth Circuit has limited the applicability of the profit-maximizing test to situations involving 1) a monopolist; 2) a market not plagued by excess capacity; 3) extremely high entry barriers; and 4) an alleged predator with costs below those of its competitors. First, "requirements" one, two, and four are not requirements at all. While it is true that in *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc., supra,* the court expressed concern over a "monopolist's"—as opposed to a "competitor's" or a "potential predator's" etc.—ability to engage in predatory pricing without setting prices below its AVC, the court used "competitor" and "discriminator," rather than "monopolist," in its definition of the profit-maximizing test. *Id.* at 890. In the Court's view, the use of "monopolist" refers to the fact that after the predator drives other firms out of the market it will be able to function as a monopolist long enough to recover its losses plus some profit because barriers to new entry prevent potential competitors from immediately entering the market. Thus, although its discussions of the profit-maximizing test refer to monopolists,

the Fifth Circuit has discussed and applied the test in cases that did not involve monopolists. *See, e.g., id.* at 891.

Similarly, there is no excess capacity requirement nor is there a requirement that the alleged predator's price be below its competitor's price. It may be argued that adding such requirements would improve the profit-maximizing test:[23] such arguments are, however, more appropriately addressed to the Fifth Circuit. As of this date, the Fifth Circuit has approved the profit-maximizing test *sans* either.[24]

■ Finally, a plaintiff is not, in all cases, required to show the existence of "extremely high" barriers to new entry to demonstrate predatory pricing under the profit-maximizing test. While it is true that the court in *International Air Indus., Inc. v. American Excelsior Co., supra,* stated that the profit-maximizing test should not be employed unless "barriers to entry are extremely high,"[25] it is clear that the plaintiff need only demonstrate that "barriers to entry are great enough to enable the discriminator to reap the benefits of predation before new entry is possible." *Id.* at 724. The higher the barriers, the more the potential predator's price may exceed its AVC and still be deemed predatory. *Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc., supra,* 735 F.2d at 889–90.

Thus, in the Court's view, there are at least two tests by which to judge predatory pricing claims in this Circuit.[26] If the profit-

---

**23.** As a practical matter, the Court cannot envision a scenario under which it would be permissible for Plaintiffs to use the profit-maximizing test notwithstanding the fact that these two "requirements" had not been satisfied. The point, however, is that Plaintiffs are not required to affirmatively demonstrate, at this stage, satisfaction of these two conditions.

**24.** Defendants' best argument in opposition to the utilization of the profit-maximizing test in this case is that "it is impossible in the airline industry to accurately calculate the short-run profit-maximizing price in advance of implementing a fare." Defs.' Mot. Summ. Jud. at 32. However, the summary judgment evidence only tends to support the inference that it is difficult, *not impossible, to calculate such a price, see* Deposition of William Gould Brugner at 100–101; Deposition of Francis A. Lorenzo at 166,

and that Continental does not employ such a test. *See* Deposition of Paul B. Dailey at 168–69; Deposition of James M. Stevens at 143–44.

**25.** *Id.* at 724 n. 31.

**26.** It is true that in *Phototron Corp. v. Eastman Kodak Co., supra,* the Fifth Circuit stated that "[o]ur Circuit defines predatory pricing as pricing below marginal or average variable cost." *Id.* at 99 n. 4. However, an intent to overrule those cases approving the profit-maximizing test cannot be inferred from this statement. The *Phototron* court's statement is illustrative of the general rule. The profit-maximizing test is applicable only under certain circumstances. In *Phototron,* the plaintiff did not contend that those circumstances existed; therefore there was no need for the court to consider the profit-maximizing test. That this is so is easily seen by look-

maximizing test is not applicable in this case it is because Plaintiffs cannot demonstrate that the barriers to new entry in the air travel industry are so high that a potential predator could drive competitors out of the market by setting prices at some level above its AVC but below the price that would maximize its profits in the short run.[27]

## C. AVERAGE VARIABLE COST DOES NOT INCLUDE FOREGONE REVENUES

▰ Finally, Plaintiffs contend that opportunity costs,[28] in the form of foregone revenues,[29] should be considered in determining AVC. As a conceptual matter, the Court does not agree.

Opportunity costs, including foregone revenues, are important because they help firms decide how to allocate scarce economic resources most efficiently; that is, firms consider opportunity costs in trying to formulate the best business strategy. Thus, the revenues foregone by choosing one allocative option over another are clearly relevant to the profit-maximizing test.

However, the costs associated with implementing a particular allocative choice, including AVC, are determined only after it is assumed that such a choice has been made. That is, given a particular decision about how to use scarce resources, one can calculate the costs of production—fixed costs, variable costs, and the like—associated with that decision. Thus, if a firm has a choice between option A and option B, the opportunity cost of choosing option A over option B includes the revenues foregone by not choosing option B, and vice versa. The firm can determine the opportunity cost of a particular choice by calculating the anticipated cost of implementing the choice not chosen and comparing it with the expected revenues. The opportunity cost is not, however, itself one of the costs of implementing a particular choice. *See In re IBM Peripheral EDP Devices Antitrust Litig.*, 459 F.Supp. 626 (N.D.Cal.1978).

Examined in the context of this conceptual framework, the Court finds no merit to the contention that foregone revenues may be considered in determining AVC. The Court understands Plaintiffs' argument to be as follows:

1) Air transportation traffic consists of full-fare business passengers and discount-fare leisure passengers;

2) The demand for full-fare tickets is price inelastic, and the demand for leisure-fare tickets is price elastic,[30] and thus a decrease in the price of the former will decrease revenues, while a decrease in the price of the latter will increase revenues; [31]

Samuelson, at 27.

ing to *Bayou Bottling, Inc. v. Dr. Pepper Co.*, *supra*, the case relied on by the *Phototron* court for its definition of predatory pricing. In *Bayou Bottling*, the court stated that "[g]enerally, in order to prove that the defendant has sacrificed present revenues, it is necessary to establish that the defendant's prices were below marginal or average variable cost." *Id.* at 305. This is a statement of the general rule; it is not the same as saying that the average variable cost test is the only possible way by which to demonstrate the existence of a predatory pricing scheme.

27. A proposition which some would certainly support. *See* Jane Baird, *Staying Airborne: Despite Industry Slump, Many Think Start–Up Carriers Have Good Chance*, Houston Chronicle, May 23, 1993, at E1.

28.
The opportunity cost of a decision arises because choosing one thing in a world of scarcity means giving up something else. The opportunity cost [of a decision to allocate economic resources to a particular activity] is the value of the good or service foregone.

29. The concept of "opportunity costs" includes many things besides foregone revenues. In the instant case, however, Plaintiffs use the term to refer to the revenues Defendants would have received had they chosen to implement a pricing plan, or plans, different from the Value Pricing plan.

30. The price elasticity of demand is a measure of the responsiveness of the quantity of output demanded by consumers to a change in price: in particular, it is the percentage change in quantity of output demanded divided by the percentage change in price. Samuelson at 65.

31. Demand is price elastic if a one percent change in price results in a change in the quantity demanded of more than one percent. Similarly, demand is price inelastic if a one percent change in price results in a change in the quantity demanded of less than one percent. *Id.* If demand is price inelastic, a price decrease reduces total revenues. Conversely, if demand is

3) The full-fare business travelers, in a sense, subsidize the leisure-fare travelers to some extent. That is, it would not make economic sense for a carrier to sell all or most of the seats on a particular flight at the typical leisure-fare price;[32] thus,

4) because of the importance of the relationship between the full-fare price to the leisure-fare price, it is necessary, after a carrier reduces its full-fare prices, to consider, in examining the carriers AVC, the revenues that it lost when it cut its prices.

The Court generally agrees with the first three propositions. The fourth, however, does not follow from them. The first three statements merely reflect the way that most air carriers have chosen to respond to the economic realities discussed in the previous paragraph, *viz.* that revenues from ticket sales must exceed TC if the carrier is to make a profit, and that revenues must, at the very least, exceed AVC for the carrier's business decisions to make economic sense.[33] That most carriers have chosen to address these realities by means of a multi-tiered pricing systems is, however, of no immediate moment. The point is that the carriers must deal with them in some way. Thus, when a carrier cuts prices from a level that is economically justifiable to one that is not (*e.g.* one that is below AVC), the conclusion that its actions are not justifiable is a natural consequence of its decision to cut prices to a level where losses exceed FC. This conclusion is independent of both the manner in which the carrier cut its prices and the reason why the particular cuts chosen resulted in losses in excess of FC. Similarly, the decrease in revenues is not a part of the AVC that the new prices are below. Rather, it is a consequence of the decision to cut prices.

## IV. SUFFICIENCY OF PLAINTIFFS' CONSPIRACY AND ATTEMPTED JOINT MONOPOLY CLAIMS

Plaintiffs assert antitrust claims under both section 1 and section 2 of the Sherman Act, 15 U.S.C. § 1 *et seq.* Defendants argue that Plaintiffs' conspiracy claim under section 1 and their attempted joint monopoly claim under section 2 are both insufficient as a matter of law and therefore subject to dismissal. The Court considers each of these contentions in turn.

### A. Section 1 Claim

To prevail on a claim under section 1 of the Sherman Act, a plaintiff must prove, in addition to damages, 1) the existence of a contract, combination, or conspiracy that 2) unreasonably restrains trade and 3) affects interstate commerce. 15 U.S.C. § 1. In the instant case, Plaintiffs allege that Defendants, together with United and Delta, conspired to engage in a predatory pricing scheme: Defendants by introducing the Value Pricing plan, the others by introducing similar plans. After these plans were implemented (Plaintiffs allege) the other air carriers would be forced to cut fares as well, even though they would suffer ruinous losses by doing so. If the conspirators could maintain their price fixing conspiracy for a sufficient length of time, and they had good reason to believe that they would be able to do so, the other competitors would be driven from the market, and the conspirators would be able to recoup their losses by raising prices to supracompetitive levels.

#### 1. Judgment on the Pleadings

Defendants contend that they are entitled to judgment on the pleadings because the acts complained of cannot support a conspiracy claim. In particular, Defendants assert that Plaintiffs' claim rests entirely on allegations concerning public statements and parallel pricing and that such allegations cannot, as a matter of law, support an inference of an unlawful conspiracy.

■ It is true that certain public statements cannot serve as a basis for antitrust liability,[34] and that statements concerning

---

32. *See supra* note 16.

33. *See supra* note 16.

34. *See, e.g., United Mine Workers of America v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965) (efforts to influence

price elastic, a decrease in price increases revenues. *Id.* at 69.

prices will not, without more, support an inference of the existence of an unlawful conspiracy. *See, e.g., In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.,* 906 F.2d 432, 448 n. 14 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991). However, where, as here, a plaintiff alleges the existence of other evidence of a conspiracy, such statements may serve as additional evidence of that conspiracy. *See, e.g., Pennington, supra,* 381 U.S. at 670 n. 3, 85 S.Ct. at 1593 n. 3.

■■■ Similarly, while it is true that evidence of parallel business behavior is insufficient, without more, to support a section one claim,[35] evidence of parallel behavior may be used to bolster other evidence which tends to indicate the existence of the conspiracy. *See, e.g., Park v. El Paso Bd. of Realtors,* 764 F.2d 1053, 1059–61 (5th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). In the instant case, since Plaintiffs have alleged the existence of other evidence tending to support the existence of a conspiracy,[36] judgment on the pleadings is not appropriate.

### 2. Summary Judgment

Alternatively, Defendants assert that they are entitled to summary judgment because they had no economic incentive to enter into a predatory pricing conspiracy and the acts cited by Plaintiffs as evidence of anticompetitive behavior do not tend to negate the inference that the alleged conspirators acted independently. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio, supra,* 475 U.S. at 588, 106 S.Ct. at 1356–57. In particular, Defendants assert that the air transportation market has been extremely competitive since deregulation: so competitive that a) any attempt to engage in predatory pricing is doomed from the outset (a contention supported by Plaintiffs' allegations that Defendants have unsuccessfully tried for over ten years to raise prices above competitive levels), and b) even assuming that Defendants could successfully conspire with United and Delta to engage in predatory pricing, the competition among the three would still be such that they would not be able to maintain supracompetitive prices long enough to recover their losses and make a profit before one reduced its fares or other competitors entered the market. *See, e.g., id.* at 590, 106 S.Ct. at 1357–58 (noting, *inter alia,* that "each competitor has a strong incentive to cheat").

Plaintiffs offer no direct evidence of an agreement to engage in predatory pricing and, indeed, do not directly challenge Defendants' factual assertions. Moreover, there is substantial evidence both that the air transportation market is highly competitive and that a change in fare price or structure or both by one carrier will inevitably result in a similar change by other carriers. Additionally, the evidence relied on by Plaintiffs to illustrate the existence of a conspiracy consists primarily of public statements by Defendants, United, and Delta about their price cuts and of the actions of the alleged conspirators in implementing these structures almost simultaneously. Certainly a reasonable fact finder could find that the alleged conspirators acted both independently and competitively. Therefore, the Court finds that Defendants have met their initial summary judgment burden. *See Matsushita, supra,* 475 U.S. at 587–88, 106 S.Ct. at 1356–57 (if alleged conspiracy is economically implausible, plaintiff must introduce evidence that suggests alleged conspirators did not act in-

public officials cannot form basis of antitrust liability regardless of motive).

**35.** *See, e.g., Theatre Enter. Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 259–60, 98 L.Ed. 273 (1954); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1158–59 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993).

**36.** Plaintiffs' Response to Defendants' Motion for Summary Adjudication was filed under seal and contains references to confidential documents. Similarly, Plaintiffs' exhibits to its Response, which are before the Court although they have not been filed of record, include many restricted documents. Therefore, the Court will not list the other evidence presented by Plaintiffs. The factors considered by the Court include numbers 3, 8, 10, 11, 13, & 14 from the list in Plaintiffs' Response on pages 36–37. *See also* Pls.' Ex. Resp. to Mot.Summ.Adj. 40–42, 46–47.

dependently). Therefore, to survive Defendants' motion, Plaintiffs must demonstrate that a genuine issue exists for trial.[37] *Id.* at 586–87, 106 S.Ct. at 1355–56.

■ Although the question is a close one, the Court is of the opinion that Plaintiffs have established the existence of genuine fact issues. First, there is evidence that for several years, Defendants attempted to cause fare prices to rise, and, in so doing, sometimes took actions that were at least arguably illegal. *See, e.g., United States v. American Airlines,* 743 F.2d 1114 (5th Cir.1984), *cert. dismissed,* 474 U.S. 1001, 106 S.Ct. 420, 88 L.Ed.2d 370 (1985). Next, there is evidence that, despite statements to the contrary, each of the alleged conspirators knew that the implementation of its new pricing plan would 1) result in fares below both its AVC and its short-run profit-maximizing price and 2) result in enormous losses that could only be recovered by charging supracompetitive prices after other competitors had been driven from the market. Ehrlich Report §§ 3.3–3.5, at 7–16, § 3.11, at 20–21; Final Expert Report of Franklin M. Fisher § 2, at 5–15 [hereinafter Fisher Report]; Levine Report § III(G), at 10; Pindyck Report at §§ 7–8, at 12–15, § 9.9, at 20–21; Report of Expert Mark E. Zmijewski §§ II–IV, at 3–7 [hereinafter Zmijewski Report]. Finally, in contrast to the alleged conspiracy at issue in *Matsushita,*[38] there is evidence that the alleged conspirators had reason to believe that they would be able to quickly drive other competitors from the market and that, thereafter, the conspirators would be able to recoup their losses plus some additional profits without having to worry about cheating and without risking increased competition from new entries into the market. Ehrlich Report §§ 5–6, at 28–31, §§ 8–9, at 32–38; Levine Report § IV, at 11–12; Zmijewski Report §§ V–VII, at 8–9. Thus, Plaintiffs' conspiracy claim is not as economically implausible as Defendants assert.

Additionally, Defendants' statements concerning the market for air transportation concern only the national market. Plaintiffs, however, have presented evidence that hub[39] and other regional markets for air transportation exist, and that a carrier that achieves frequency dominance[40] at a particular hub will receive a disproportionate share of the revenues, that is, its percentage of total revenues will be greater than its percentage share of total flights. Levine Report § V, at 12–25; Transcript of Evidentiary Proceeding, March 1, 1993, Morning Session, at 17–19 (testimony of Dr. Ehrlich) [hereinafter Transcript]. Moreover, because of supply substitutability[41] problems as well as barriers to new entry, a carrier with frequency dominance at a hub will be able to raise fares to supracompetitive levels and maintain them at those levels much longer than it would be able to in a perfectly competitive market. Ehrlich Report, § 4.1.2.7, at 24; Levine Report § V(I), at 25.

37. Defendants do not assert that Plaintiffs lack standing because they have not alleged that they have suffered an injury as a result of Defendants' anticompetitive conduct.

38. The conspiracy alleged in the instant case is certainly more plausible than the one at issue in *Matsushita,* where, more than two decades after the alleged conspiracy began, the alleged conspirators had still not driven their largest competitors from the market; one of those competitors held a larger market share than any of the alleged conspirators; and the conspirators would have had to continue to maintain the conspiracy for years just to break even. 475 U.S. at 590–93, 106 S.Ct. at 1357–59.

39. The hub and spoke system is a system whereby air travelers with many different ultimate destinations are transported from many different airports to a central airport, rearranged according to destination, and then sent on their way.

40. That is, a carrier that has a sufficient number of flights in excess of other carriers that use that hub.

41. The concept of substitutability embraces two subconcepts: demand substitutability and supply substitutability. The former considers the probability that, given an increase in the fare from Point A to Point B, a consumer will drive to another airport to take a cheaper flight to Point B. The latter considers the probability that, given an increase in fares by one carrier in one market, another carrier will divert resources from another market to that market. Plaintiffs' evidence suggests that the phenomenon of frequency dominance makes it difficult for a carrier to move service from one market to another in response to a price increase if another carrier has frequency dominance in the second market.

Thus, there is evidence that the alleged conspirators had reason to believe that, even if they failed to drive competitors out of the national market, they could still recoup their losses and make a profit by driving competitors from certain hub markets (and perhaps other regional markets). Once one of the conspirators acquired a sufficiently large share of the market at a particular hub, it could, because of the frequency dominance effect, the problem of supply substitutability and the like, maintain prices at a supracompetitive level. *See* Ehrlich Report §§ 4.1.1–4.1.5, at 21–26, § 9, at 34–38; Fisher Report §§ 3.6–3.8, at 17–18.

Finally, Defendants' statements regarding the competitiveness of the air transportation market cut both ways: they also tend to support an inference that the alleged conspirators could have reasonably believed that their scheme had a good chance of success because the factors cited by Defendants would tend to mask Defendants' actions. Air carriers tend to match the price changes of other air carriers. Thus, the alleged conspirators could have reasonably assumed that it would not attract too much unwanted attention if other airlines lowered (at the beginning of the conspiracy) or raised (after smaller competitors had been driven from the market) their prices in response to American's price initiatives. Moreover, many inefficient air carriers have gone bankrupt since deregulation,[42] and observers might tend to credit the passing of a few more smaller carriers to inefficiency rather than to predatory pricing.

Thus, in the Court's view, genuine issues of material fact exist concerning Plaintiffs' conspiracy claim. At the same time, however, the Court recognizes that 1) in general, predatory pricing claims are rarely sustainable,[43] and that 2) this is especially true, where, as here, it is alleged that no express agreement existed among the alleged conspirators and that an implicit agreement was solicited by means of apparently innocuous statements

concerning prices by one alleged conspirator (Defendants) and was assented to by the others by means of the adoption of similar fare structures and prices. Therefore, the Court will not hesitate to revisit this issue and decide it summarily if appropriate.

### B. Section 2 Claim for Attempted Joint Monopolization

Similarly, neither judgment on the pleadings nor summary judgment is appropriate as to Plaintiffs' attempted joint monopolization claim under section 2 of the Sherman Act.[44]

 To prevail on a claim of attempted monopolization under section 2, a plaintiff must prove

1) that the defendant has engaged in predatory or anticompetitive conduct with

2) a specific intent to monopolize and

3) a dangerous probability of achieving monopoly power.

*Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, —— – ——, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993). To prevail on a claim of attempted joint monopolization, plaintiff must prove that the defendant, having a specific intent to monopolize, solicited other firms to engage in anticompetive conduct. *United States v. American Airlines, Inc., supra,* 743 F.2d at 1121 (criminal case).

 The Court has already determined that 1) a genuine issue of material fact exists as to whether, in announcing and implementing the Value Pricing plan and taking other actions, Defendants intentionally attempted to solicit United's and Delta's participation in a predatory pricing scheme and 2) that there exists evidence that tends to suggest that the scheme was likely to succeed. Therefore, genuine issues for trial exist regarding Plaintiffs' attempted joint monopolization claim.

Defendants' arguments to the contrary are inapposite. First, contrary to Defendants'

---

42. *See, e.g., supra* note 13.

43. *See, e.g., Matsushita, supra,* 475 U.S. at 590, 106 S.Ct. at 1357–58.

44. Section 2 provides that

[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

assertion, Plaintiffs' claim does not depend on Defendants' ability to form a conspiracy with United and Delta after the other competitors had been driven from the market. Rather, Plaintiffs allege that Defendants solicited United and Delta with the intent that they immediately begin to engage in anticompetitive behavior.

Similarly, Defendants reliance on *Indiana Grocery, Inc. v. Super Value Stores, Inc.*,[45] is misplaced. In *Indiana Grocery,* the court affirmed, *inter alia,* the trial court's order granting summary judgment as to the plaintiff's attempted joint monopoly claim because, at best, the plaintiff's summary judgment evidence tended only to establish anticompetitive conduct on the part of the defendant aimed at creating an oligopoly. *Id.* at 1415–16. In the instant case, by contrast, as noted above, there is evidence that, if Delta and United had accepted Defendants' alleged offer, each would have been able, after a period of predatory pricing, to exercise monopoly power in some relevant markets.

Finally, Defendants' implication that Plaintiffs' claim must be dismissed because it is not as strong as the one presented in *United States v. American Airlines, Inc., supra,* is without merit. In *American Airlines,* the Fifth Circuit reversed the trial court's order dismissing the complaint for failure to state a claim. In particular, it held that the trial court erred in holding that more than a solicitation to monopolize is required to state a claim for attempted joint monopolization and that the complaint at issue failed to state a claim because it did not allege the existence of an agreement to monopolize. *Id.* at 1115. The court did not, however, hold that, to state a claim for attempted joint monopolization, a plaintiff must present at least as compelling a claim as the one presented by the United States in *American Airlines.* Thus, while it is true that the claim of attempted joint monopolization at issue in *American Airlines* was much stronger than the one presented in this case, it does not follow that Defendants are entitled to summary adjudication.

**45.** 864 F.2d 1409 (7th Cir.1989).

**46.** The Court notes that Defendants have not moved for summary judgment on the ground that

## V. COLLATERAL ESTOPPEL AND THE RELEVANT MARKET ISSUE

Defendants assert that Plaintiffs are collaterally estopped from claiming that the relevant market in air transportation is anything other than the national market by the district court's decision in *In re Air Passenger Computerized Reservations Sys. Antitrust Litig.,* 694 F.Supp. 1443 (C.D.Cal.1988), *aff'd sub nom. Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992) ("*Computerized Reservations*").[46] In *Computerized Reservations,* several plaintiffs, including Continental and Northwest, sued American and United, asserting claims for various allegedly anticompetitive acts arising out of the defendants' ownership of computerized reservation systems. The defendants moved for summary judgment as to two of the plaintiffs' claims, and the court granted the motion in part and denied it in part. In particular the court found that Continental, the only plaintiff to argue that relevant markets other than national market existed, had failed "to present evidence supporting its contention that a city pair or hub constitutes a relevant market in the air transportation industry." *Id.* at 1468. Therefore, the court held that, as a matter of law, the only relevant air transportation market was the national market. Thereafter, Continental settled its claims.

Northwest, on the other hand, did not dispute American's contention that the national market was the only relevant air transportation market. *Id.* at 1467. After the Court ruled on the defendant's motion for summary judgment. Northwest proceeded to trial on its remaining claims. After a jury returned a verdict in favor of each defendant, Northwest appealed the trial court's order granting summary judgment but not the order granting judgment on the jury verdict. *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 539 nn. 3–4 (9th Cir.1991),

no genuine issue of material fact exists as to whether relevant markets other than the national market exist.

*cert. denied,* —— U.S. ——, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992). The Ninth Circuit affirmed the judgment of the district court.

■ A party is collaterally estopped from relitigating an issue if 1) the party litigated the issue in a prior action; 2) the issue was finally decided in that action; and 3) the decision was necessary to the court's judgment. Jack H. Friedenthal, et al., Civil Procedure § 14.11, at 671–72 (1985) [hereinafter Civil Procedure]. Because Continental settled its claims prior to trial and Northwest did not, the issues involved in determining the collateral estoppel effect of *Computerized Reservations* decision as to each Plaintiff are different. Therefore, the Court will treat each Plaintiff separately.

## A. CONTINENTAL

In the instant case, the primary issue before the Court regarding Continental is whether the relevant market issue was finally decided in *Computerized Reservations.* The Court initially understood the parties to agree that an order granting partial summary judgment is a final decision for collateral estoppel purposes in the Ninth Circuit but not in the Fifth Circuit. Given this understanding, the Court expressed grave reservations concerning American's position, which is that this Court should ignore Fifth Circuit decisions and instead follow conflicting Ninth Circuit decisions. Having read Defendants' Motion for Summary Adjudication and Plaintiffs' Response and having conducted its own research, the Court is now convinced that its original understanding was probably in error.

### 1. Fifth Circuit and Ninth Circuit Precedent

In the Court's view, the purported conflict between the decisions of the Fifth Circuit

and the decisions of the Ninth Circuit does not exist. As a general rule, a party is not precluded from relitigating an issue "if appellate review could not have been obtained of the judgment in the first action." Charles A. Wright, Law of Federal Courts § 100A, at 683 (4th ed. 1984) [hereinafter Federal Courts]. The Ninth Circuit follows this rule. *See, e.g., Pena v. Gardner,* 976 F.2d 469, 472 (9th Cir.1992) (party is precluded from relitigating issue if it has previously litigated issue in another action and "the issue was lost as a result of a final judgment in that action"); *Luben Indus., Inc. v. United States,* 707 F.2d 1037, 1039–40 (1983) (interlocutory order that was not immediately appealable when entered not entitled to preclusive effect). The Fifth Circuit also follows this rule. *See, e.g., Avondale Shipyards, Inc. v. Insured Lloyds,* 786 F.2d 1265, 1269–72 (5th Cir.1986). Thus, the Court perceives no direct conflict between Fifth Circuit precedent and Ninth Circuit precedent.

It is true that the Fifth Circuit has not adopted the "finality" standard set forth in the Restatement (Second) of Judgments. *Id.* at 1271. Defendant claims that the Ninth Circuit has adopted this more flexible standard [47] "and has accorded collateral estoppel effect to partial summary judgment decisions." Notwithstanding this contention, in the district court case relied on by Defendants in support of this proposition, the court expressly stated that "[t]he Ninth Circuit has not ruled on the issue [of the preclusive effect of a partial summary judgment]...." *Scripps Clinic & Research v. Genentech, Inc.,* 678 F.Supp. 1429, 1436 (N.D.Cal.1988), *aff'd,* 927 F.2d 1565 (Fed.Cir.1991).[48] Moreover, Defendants have not cited, and the court has not found, any Ninth Circuit decisions that give preclusive effect to a nonfinal, unappealable partial summary judgment or-

---

47. *See Robi v. Five Platters, Inc.,* 838 F.2d 318, 327 (9th Cir.1988).

48. In *Eichman v. Fotomat Corp.,* 759 F.2d 1434 (9th Cir.1985), the case relied on by the *Scripps* court for the proposition that the "pendency of an appeal does not bar giving preclusive effect to the judgment appealed from[,]" *Scripps,* 678 F.Supp. at 1436, the court stated, in dicta, that

"[t]he federal rule on the preclusive effect of a judgment from which an appeal has been taken is that the pendency of an appeal does not suspend the operation of an *otherwise* final judgment for purposes of *res judicata.*" *Eichman,* 759 F.2d at 1438 (emphasis added). This statement is not in conflict with the Court's holding today that the relevant market decision in *Computerized Reservations* was not a final decision.

der.[49] *See Avondale Shipyards, supra,* 786 F.2d at 1270 ("We are not aware of any federal appellate decision which has applied preclusion to a prior nonfinal ruling as to which appellate review was unavailable, nor any which contradicts our ... opinions stating that partial summary judgment orders under Rule 56(d) are not preclusive."). Indeed, in *Luben Indus., Inc. v. United States, supra,* the Ninth Circuit affirmed the district court's judgment that an interlocutory order was not entitled to preclusive effect. *Id.* at 1040.

However, notwithstanding the apparent lack of conflict between the decisions of the Fifth and Ninth Circuits, the case law, at least the Fifth Circuit case law, clearly indicates that courts should look to the substance of the prior decision and not the form to determine whether a meaningful opportunity for appellate review was available. For example, in *Royal Ins. Co. v. Quinn–L Capital Corp.,*[50] the court, while recognizing the general rule that "orders of partial summary judgment, standing by themselves, have no preclusive effect, as they are interlocutory[,]"[51] held that the summary judgment order at issue was entitled to preclusive effect because "the 'partial' summary judgment was 'partial' in name only. It decided the major issues in the case and entry of the final judgment was a mere formality."[52] *Id.*

■ The partial summary judgment order in *Computerized Reservations* was not

"partial in name only": several issues remained to be tried. Thus, in contrast to *Quinn–L,* more than the ministerial act of entering a final judgment remained before Continental could appeal. Rather, to secure appellate scrutiny of the trial court's order, Continental would have had to proceed to trial on the remaining issues; only after a final judgment had been entered could it have sought appellate review of the partial summary judgment order. Therefore, regardless of which circuit's "law" applies, the *Computerized Reservations* decision is not entitled to preclusive effect, and Continental is not collaterally estopped from litigating the relevant market issue.

Defendants, however, argue that the fact that the *Computerized Reservations'* order was nonfinal, both in form and substance, when rendered is irrelevant: the order became final once the case settled.

[i]t is the general rule in federal courts—acknowledged in *Avondale*—that issues actually litigated and necessarily adjudicated in an action prior to settlement may be accorded collateral estoppel effect, even though "interlocutory" when rendered and never subject to appeal. Unlike an "interlocutory" ruling made in a case still pending, once the case is settled, these findings are no longer subject to reversal by the district court. In contrast, where interlocutory decisions are not accorded collateral estoppel effect, it is usually because the

**49.** In *Guild Wineries & Distilleries v. Whitehall Co.,* 853 F.2d 755 (9th Cir.1988), the Ninth Circuit held that an unreviewed, *final* administrative adjudication was entitled to preclusive effect. In *Robi v. Five Platters, Inc., supra,* the court gave preclusive effect to, *inter alia,* a district court's order in one case granting a preliminary injunction and an order in another case granting a motion to dismiss. *Id.* at 326–27. The plaintiff in the first case was the defendant in the second case and vice versa, and in both cases, the district court based its order on the preclusive effect of a prior state-court judgment. *Id.* at 323. In this Court's opinion, neither *Guild Wineries* nor *Robi* supports the proposition that a federal court sitting in the Ninth Circuit would give preclusive effect to the relevant market decision in *Computerized Reservations.*

**50.** 960 F.2d 1286 (5th Cir.1992). This exception was first recognized by the Fifth Circuit in *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d

1149 (5th Cir.1982), *vacated on other grounds,* 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983), in a decision characterized by Professor Wright as "surprising." Federal Courts, *supra* § 100A, at 683 n. 38. On remand from the Supreme Court, however, the Fifth Circuit, sitting en banc, vacated the original panel opinion and the case thereafter settled. *Avondale Shipyards, supra,* 786 F.2d at 1273 n. 11.

**51.** *Id.* at 1295 n. 11. *See also Avondale Shipyards, supra,* 786 F.2d at 1272.

**52.** Similarly, in *Chemetron Corp. v. Business Funds, Inc., supra* (which is not an authoritative statement of the law in this circuit), the court gave preclusive effect to a nonfinal, interlocutory judgment in part because "the case was *fully* litigated, [but] entering judgment on the findings and conclusion was prevented by a last-minute settlement...." *Id.* at 1190 n. 86.

case in which the decision was rendered is still pending. In that situation, out of respect for a court's continuing authority to reconsider its own interlocutory rulings, some courts simply await entry of final judgment before according such ruling collateral estoppel effect.

Defs.' Mot. Summ. Adj. at 53 n. 65.

 There is something to be said for this argument. Certainly, one of the reasons nonappealable, interlocutory decisions are not accorded preclusive effect is that the court rendering the decision has the power to reconsider. *See, e.g., Avondale Shipyards,* 786 F.2d at 1269. However, the Fifth Circuit has never suggested, in either *Avondale* or in any other decision, that a nonfinal, unappealable decision that is not preclusive when rendered becomes preclusive if the case settles prior to trial, nor does this Court think the Fifth Circuit would be inclined to craft such a rule.[53]

First, it can not be said with certainty that any such order would ever have been subject to appellate scrutiny or that it would have been essential to any final judgment ultimately entered. *See Id.* at 1271. For example, in *Computerized Reservations,* although the court ruled against Continental on the relevant market issue, it held that a genuine issue for trial existed as to one of Continental's attempted monopolization claims.[54] Continental might have proceeded to trial on this issue, prevailed, and been satisfied with that outcome. In such an event, the district court's ruling would not have been essential to the final judgment. Alternatively, Continental might have proceeded to trial and appealed the relevant market decision after the entry of a final judgment, but the appellate court might have affirmed on other grounds,[55] or the Court might have remanded the case for trial without considering the relevant market issue and Continental might have subsequently prevailed without having to litigate it, etc. Thus, unlike the order at issue in *Quinn–L,* it cannot be said with certainty that Continental would have ever been able to obtain appellate scrutiny of the relevant market decision in *Computerized Reservations* or that the decision would necessarily have been essential to any final judgment ultimately entered.

 Moreover, in applying the doctrine of collateral estoppel a court must be careful not to contravene public policy, such as the policy to encourage settlements. *Chemetron Corp. v. Business Funds, Inc., supra,* 682 F.2d at 1189–90. Indeed, in *Chemetron,* a case relied on by Defendants, the court gave preclusive effect to a nonbinding, interlocutory order in part because the party seeking to avoid the preclusive effect of that order had fully litigated the case and had settled at the last minute solely to avoid being prohibited from relitigating adversely decided issues. *Id.* at 1190. Not so in the instant case: the litigation was settled prior to trial and prior to any determination, final or otherwise, of many of the issues in dispute. A rule such as that suggested by Defendants would discourage settlement in cases such as *Computerized Reservations:* a party would be less likely to settle a case after an adverse interlocutory ruling for fear of being barred from ever revisiting that issue. Such a rule would thus be contrary to public policy.

## 2. *Controlling Law*

Assuming, however, for the sake of completeness, that the decisions of the Fifth Circuit conflict with those of the Ninth Circuit and that the *Computerized Reservations* decision would be entitled to preclusive effect

---

53. In the Court's opinion, Defendants may have confused collateral estoppel with the doctrine of "law of the case."

54. Thus, Continental did not forego an immediate right to appeal. *See In re Duncan,* 713 F.2d 538, 542 (9th Cir.1983) (alien who did not appeal adverse decision in naturalization proceeding but chose instead to reapply for naturalization and raise same arguments held collaterally estopped from relitigating constitutional claims decided in first action).

55. *See, e.g., Fireman's Fund Ins. Co. v. International Market Place,* 773 F.2d 1068, 1069 (9th Cir.1985) ("if the appellate court affirms on one ground used by the trial court without passing on a second ground ... the second ground does not have preclusive effect") (citing 1B J. Moore, Moore's Federal Practice ¶ 0.416[2], at 518 (2d ed. 1984)).

according to Ninth Circuit precedent but not according to Fifth Circuit precedent, the Court does not agree with Defendants' contention that federal principals of comity and preclusion require this Court to ignore the statements of the Fifth Circuit and instead to follow the conflicting decisions of the Ninth Circuit.

It is true, as Defendants point out, that "federal judgments are presumptively entitled to respect in all other federal courts." This point, however, is not in issue. Rather, the issue is whether, as a matter of *federal* law, not as a matter of Ninth or Fifth Circuit "law," an order granting partial summary judgment is, or can be, a final decision for collateral estoppel purposes. If it is a final decision, then it must be given preclusive effect. However, comity, in the sense that under principals of comity and federalism a federal court must recognize a judgment of the court of a sovereign state, has nothing to do with this determination. As the Court explained in its previous Order,

> the Full Faith and Credit Clause mandates that a state court must measure the preclusive effect of a prior state-court judgment according to the law of the state where the judgment was rendered. Similarly, the principals underlying the Full and Faith Credit clause together with the principals of comity and federalism dictate that federal courts honor the preclusive effects of state-court judgments. Principals of comity and federalism together with the Supremacy Clause likewise mandate that state courts judge the preclusive effects of federal judgments according to federal law.
> No such notions support the proposition that a federal district court sitting in one circuit should measure the preclusive effect of a judgment rendered in another circuit by the law as it is applied in the other circuit, and therefore it does not follow that this Court is bound to measure the preclusive effect of the holding in *Com-*

*puterized Reservations* by Ninth Circuit precedent rather than by Fifth Circuit precedent. First, a circuit is not a forum in the same sense that a state is or in the sense that a federal court is a federal forum. Unlike the states or the federal government as a whole, a circuit is not a sovereign. Thus, while all federal courts have an interest in protecting the rights of litigants and ensuring that valid judgments are enforced, an individual circuit does not have the interest of a sovereign in ensuring that its citizens in particular are protected or that the law of the circuit is given effect in the other circuits.

Ct.'s Order Feb. 12 (Instrument 57).

 Thus, while it is true that this Court must give appropriate preclusive effect to all judgments of other federal courts, both those within and those without the Fifth Circuit, it is also true that to determine which decisions are final decisions and therefore entitled to preclusive effect this court must look to federal law. *Avondale Shipyards, supra,* 786 F.2d at 1269 n. 4. This Court is absolutely bound to follow the pronouncements of the Fifth Circuit and the Supreme Court as to what is, and what is not, federal law. Where neither has spoken, the Court may determine federal law for itself, and in so doing, it may be guided by the nonbinding decisions of other courts. Where the Fifth Circuit has spoken, however, this court is not free to deviate from that court's mandate, even if this entails giving an effect to an order of another federal court that is different from the effect that would be given to that order by the courts of another circuit. Of such conflicts are Supreme Court decisions made.

 None of the cases cited by Defendants are in conflict with this proposition.[56] In particular, neither of the cases cited by Defendants which address collateral estoppel, as opposed to *res judicata*,[57] considers

---

**56.** Interestingly, Defendants argue that "if the shoe were on the other foot" the federal courts sitting in the Ninth Circuit would follow the decisions of the Fifth Circuit rather than the conflicting decisions of the Ninth Circuit, but cite not a single authority in support of this rather extraordinary proposition.

**57.** In its broadest sense, the term *res judicata* encompasses both claim preclusion—"true" *res judicata*—and issue preclusion, *e.g.* collateral estoppel. *Avondale Shipyards, supra,* 786 F.2d at 1269 n. 3. However, as noted below, there is no question that this Court is bound to respect the

whether a federal court should treat an issue as finally decided if it would be considered finally decided under the decisions of the circuit in which the issue was originally litigated but not under the decisions of the circuit in which the court evaluating the preclusive effect of the decision sits.

For example, in *Miller Brewing Co. v. Falstaff Brewing Co.,* [58] the First Circuit held that Miller Brewing was estopped from denying that "lite" is a generic term because it had previously litigated that issue to judgment. In response to Miller's argument that it was not collaterally estopped by a previous Seventh Circuit decision, the court noted that it had already litigated that issue in a subsequent Seventh Circuit case. There was no issue concerning the priority of one circuit's collateral estoppel decisions over the conflicting decisions of another.

Similarly, in *State of Texas v. United States,* [59] the district court held that a prior decision of a three-judge panel of the Southern District of Texas was not entitled to preclusive effect because the particular issue in question was not finally decided by the panel. *Id.* at 483–84. There was no issue as to whether the court should consider Fifth Circuit law as opposed to the law of the District of Columbia Circuit. Indeed, in contrast to the instant case, there was no apparent conflict between the two.

Thus, assuming that a conflict exists between Ninth Circuit and Fifth Circuit law, the Court is of the opinion that it must follow the law as enunciated by the Fifth Circuit. Therefore, Continental is not collaterally estopped from relitigating the relevant market issue.

## B. NORTHWEST

■ By contrast, Northwest argues that it is not estopped from litigating the relevant market issue because it did not actually litigate this issue in the course of the *Computerized Reservations* litigation. *See* Civil Procedure, *supra* § 14.11, at 672 (collateral estoppel does not apply unless issue was actually litigated in prior action). At first blush, this argument appears specious. Northwest was present and accounted for in *Computerized Reservations:* indeed, it litigated its claims to judgment. In particular, it was fully aware of American's claim that the national market is the only relevant air transportation market. That it chose not to join issue with this contention at that time should not mean it is free to do so now. The issue was actually litigated and Northwest had a full and fair *opportunity* to join the fray; this is all that is required.[60]

For example, in *Royal Ins. Co. v. Quinn–L Capital Corp., supra,* the appellants argued that they were not bound by a prior judgment because the court that rendered the judgment lacked subject matter jurisdiction. The Fifth Circuit, applying collateral estoppel principals,[61] held that the appellants could not contest the first court's jurisdiction even if the issue had not been raised in the first proceeding.

> The question is not whether the issue of subject matter [jurisdiction] was actually litigated, but instead whether the parties had the opportunity to raise the question.

final judgments of other federal courts. Rather, the precise issue before the Court is not whether final decisions should be given preclusive effect but whether the relevant market issue was finally decided in *Computerized Reservations*. The cases concerning res judicata cited by Defendants are not helpful on this point.

**58.** 655 F.2d 5 (1st Cir.1981).

**59.** 802 F.Supp. 481 (D.D.C.1992).

**60.** Northwest does not assert that relevant market issue litigated in *Computerized Reservations* was different from the relevant market issue presently before the Court. *Id.* § 14.11, at 662 ("Just as res judicata requires that the cause of

action to be precluded be identical to the one already litigated, collateral estoppel demands identity of issues.").

**61.** The court quoted the Supreme Court's statement in *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 n. 9, 102 S.Ct. 2099, 2104, n. 9, 72 L.Ed.2d 492 (1982) that "principles of res judicata apply to jurisdictional determinations—both subject matter and personal." As noted above, the term *"res judicata,"* in its broadest sense, refers to both claim and issue preclusion. Since the Fifth Circuit was discussing, not the previous judgment as a whole, but the issue of subject matter jurisdiction, it can be assumed that the court meant to apply the doctrine of collateral estoppel.

If the parties against whom judgment was rendered did not appeal, the judgment becomes final and the court's subject matter jurisdiction is insulated from collateral attack.

*Id.* at 1293 (citation omitted).

In the instant case, however, it cannot be gainsaid that none of Northwest's claims in *Computerized Reservations* involved a claim based on the monopolization or the attempted monopolization of the air transportation market, national or otherwise. *See* Pl.s' Ex. 44 at 24 (American's Motion for Summary Judgment in *Computerized Reservations* ). Thus, Northwest had neither the opportunity nor the incentive to litigate the relevant market issue at any point during the proceedings: indeed, after Continental dropped out, the issue was a dead letter. Moreover, because Northwest's claims had nothing to do with the air transportation market, the district court's order relative to the relevant market was not essential to the final judgment ultimately entered against Northwest.

Thus, the instant case is distinguishable from the cases relied on by Defendants. For example, in *In re Gottheiner,* [62] the court held that a party was bound by a previous, adverse order of summary judgment where the party actively litigated the case for sixteen months but failed to oppose the motion. In the instant case, by contrast, Defendants do not contest Northwest's assertion that, in *Computerized Reservations,* it did not give up a claim based on American's alleged monopolization of an air transportation market after actively participating in discovery, but rather never asserted such a claim. Moreover, because Northwest never asserted such a claim, Northwest's interests were not aligned with Continental's as to the relevant market issue. Therefore, Northwest is not estopped from litigating the relevant market issue.

## C. CHANGED CIRCUMSTANCES

■ Additionally, even if Defendants were correct as to the doctrinal position they advance, Plaintiffs have established that fact issues exist as to whether the change in the airline industry's understanding of competition at the hub and individual airport level is a "significant fact[ ] creating [a] new legal condition[ ]" that bars the application of collateral estoppel. *Jackson v. DeSoto Parish School Bd.,* 585 F.2d 726, 729 (5th Cir.1978).

As an initial matter, the parties bitterly contest whether the appropriate date to judge the preclusive effect of the *Computerized Reservations* decision is 1986—the date Continental asserts discovery closed—or August, 1988—the date the decision was rendered. The Court, however, does not regard this as a significant issue. It is true, as Defendants assert, that the burden is on Plaintiffs to show that circumstances have changed and that they cannot meet this burden with evidence that could have been obtained before the first decision was rendered or with arguments that could have been made to the first court. However, Defendants' attempt to strictly limit Plaintiffs to evidence of events that occurred after August, 1988 is unwarranted.

Even assuming that Defendants are generally correct and that Plaintiffs may not look to evidence that predates the *Computerized Reservations* decision, it must be remembered that Plaintiffs' contention that relevant markets other than the national market exist involves, not a body of undifferentiated evidence, but three interdependent things: 1) a set of facts about air carrier behavior; 2) another set of facts about the effects of the behavior described by the first set of facts; and 3) a conceptual model that explains why the second set occurred (or became true) given the first set. These three elements are not independent. Thus, even if it were true that prior to the decision in *Computerized Reservations,* air carriers were already behaving in the manner asserted by Plaintiffs (*e.g.,* establishing hub and spoke systems etc.), this fact is not dispositive of the changed circumstances issue. Plaintiffs may still be able to show that circumstance have changed if they can show that the effects of the air carriers' behavior were not well known prior to the decision in *Computerized Reservations* or that no conceptual frame-

**62.** 703 F.2d 1136 (9th Cir.1983).

work existed for evaluating these effects prior to that time.

In the instant case, the Court is of the opinion that, at the very least, Plaintiffs' have demonstrated that a genuine issue of material fact exists as to whether the effects, such as frequency dominance, substitutability, etc., of air carrier behavior, such as establishing hubs, were sufficiently well known by 1988 such that Plaintiffs should not be estopped from relitigating the relevant market issue.[63] *See, e.g.,* Transcript at 74.

## VI. COURT'S RULING

Therefore, it is hereby ORDERED, AD-JUDGED, and DECREED that Defendants' Motion for Judgment on the Pleadings pursuant to Fed.R.Civ.P. 12(c) is GRANTED as to Plaintiffs' state-law claims for tortious interference with business relations and unfair competition.

It is further ORDERED that, as discussed in Part IIC of this Order, evidence of opportunity costs, in the form of foregone revenue, will not be considered as part of Defendants' average variable cost.

It is further ORDERED that, in all other respects, Defendants' motion is DENIED.

It is further ORDERED that the parties file no further pleadings on this matter in this Court. In particular, the Court will not consider any motions for reconsideration or the like.

IT IS SO ORDERED.

### ORDER

Before the Court is Defendants' Motion for Summary Adjudication. For the reasons stated below, the Court is of the opinion that the motion should be GRANTED IN PART and DENIED IN PART.

---

**63.** The parties also place great emphasis on one another's admissions in unrelated lawsuits. While there is some merit to each of these arguments, the Court is not convinced that the existence of these "admissions" requires that any party be estopped from asserting any position currently urged before this Court.